[No. S037302. Jan. 26, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
ERIC LAMONT HINTON, Defendant and Appellant.

**COUNSEL**

Jay L. Lichtman and Tracy J. Dressner, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—A Los Angeles County jury convicted defendant Eric Lamont Hinton of the first degree murders of Landis Barnes, Albert Brown, and Tenoa Stevenson; selling a substance in lieu of a controlled substance, while personally armed with a firearm; and attempted robbery, with personal use of

a firearm. (Pen. Code, §§ 187, subd. (a), 664, 211, 12022, subd. (a), 12022.5, subd. (a).)[1] The jury also found true the burglary-murder, robbery-murder, and prior-murder-conviction special circumstances as to these three murders as well as a multiple-murder special circumstance. (§ 190.2, subd. (a)(2), (3), (17)(A) & (G).) After a penalty trial, the jury returned a verdict of death. The court denied defendant's motions for a new trial (§ 1181) and to modify the penalty verdict (§ 190.4, subd. (e)) and sentenced defendant to death.

This appeal is automatic. We affirm the judgment.

## I. BACKGROUND

On May 24, 1988, Landis Barnes, Albert Brown, and Brown's cousin Tenoa Stevenson were shot in a Best Western motel room in Monterey Park during a drug deal. Barnes and Brown died at the scene. Stevenson managed to stagger outside but was chased by two men in a silver BMW, one of whom exited the vehicle to pursue him on foot and shoot him again, fatally, in a nearby used car lot.

Maribelle Santiago, who worked as a "runner" for Stevenson and who testified under a grant of immunity, identified defendant and Steve Hicks as having been with Barnes, Brown, and Stevenson at the motel shortly before the murders. Joel Stephen Cunningham, a convicted felon who also testified under a grant of immunity, confirmed that defendant and Hicks were in the motel room with Barnes, Brown, and Stevenson when the shooting started. Brett Johansen, who had just purchased some groceries at a nearby market, witnessed two men in a BMW chase Stevenson down. Johansen's description of the BMW's driver was consistent with Hicks's appearance; his description of the passenger—and shooter—was consistent with defendant's appearance.

After a series of false statements to police following his arrest, defendant eventually admitted being in the motel room with Hicks during the drug transaction when the shooting started, but claimed Hicks was the shooter. He also admitted pursuing Stevenson in the BMW, but claimed he did so only because Hicks held him at gunpoint. He denied shooting anyone and claimed that Hicks alone shot and killed Barnes, Brown, and Stevenson, using two different guns.

After these police interviews, defendant was released. On August 6, 1989, he murdered Dwayne Reed at a gas station in Los Angeles. Defendant was convicted of this murder, which was the basis for the prior-murder-conviction

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

special circumstance, on June 5, 1992. He was convicted of the Barnes, Brown, and Stevenson murders and sentenced to death on February 25, 1993.

### Murders of Barnes, Brown, and Stevenson

In May 1988, Tenoa Stevenson asked his friend Joel Stephen Cunningham for help in finding a supplier of kilo-size quantities of cocaine. Cunningham thought immediately of Landis Barnes, whom he had met a few days earlier. At that time, Barnes had said he "had friends who could produce kilos of cocaine." Cunningham introduced Barnes to Stevenson and Stevenson's cousin, Albert Brown. Stevenson said he wanted to buy five kilos. Barnes said he would need to find out the details—such as the price, the supplier, and the time and place of the transaction—from "his people" and then arrange another meeting.

The next day, Barnes confessed to Cunningham that he was "having problems connecting with the people that he gets his answers from" and suggested they cruise the neighborhood to try to find "the person that [they] were looking for." Barnes explained that his suppliers would not allow him to deliver the cocaine and that the cocaine would be delivered "personally" by these suppliers. Barnes and Cunningham drove around Lynwood until Barnes pointed out defendant and said, "That's him over there." Barnes stopped the car and got out to talk to defendant while Cunningham stayed in the car. When Barnes returned from talking with defendant, he told Cunningham that "things are going to work out." Barnes called Stevenson, told him he could supply four kilos (instead of the five requested), and asked where he wanted the transaction to take place. After Barnes hung up, he told Cunningham that Stevenson had asked to meet the next day at a gas station in the Crenshaw area. Cunningham was to receive $8,000 for his role in introducing the parties, and an additional $500 per kilo from Stevenson if it worked out well.

Cunningham, Stevenson, Brown, and Barnes waited at the gas station the next day, but no one showed up with the drugs. The principals then arranged to meet at 11:00 p.m. the next night, May 24, 1988, at a 7-Eleven in Monterey Park.

When Cunningham arrived at the 7-Eleven, Stevenson and Brown were sitting in Stevenson's black dually truck. After Barnes drove up in his BMW, defendant and Hicks arrived in defendant's Volkswagen Beetle. Defendant spoke first to Barnes and then to Stevenson. It appeared to Cunningham that defendant was directing Barnes in the transaction. Stevenson told defendant that it was not "cool" to conduct the transaction in the parking lot and suggested they go instead to the nearby Best Western motel. After Hicks transferred a plastic shopping bag of wrapped packages from defendant's

Beetle to Barnes's BMW, defendant and Hicks got in Barnes's car, Cunningham got in his Jeep, and they all followed Stevenson to the motel. Barnes obtained a key from the motel office, opened the room, and entered it. Cunningham, Stevenson, and Brown (who carried a bottle of Clorox bleach to test the purity of the cocaine) followed.

Barnes went back outside to see what defendant and Hicks were doing. They said they wanted to see the money, so Stevenson called his "runner," Maribelle Santiago, and asked her to come to the motel. (Stevenson had previously given Santiago a black nylon tennis bag with $57,000 in cash.)

When Santiago drove up, Stevenson and defendant walked up to her car. Defendant said he wanted to see the money. Stevenson said he would show it to him and unzipped the bag. Stevenson tossed one bundle of cash—$5,000—into Maribelle's car and took the bag, saying, "Go around. I'll call you to come back."

When Stevenson entered the room, Cunningham asked, "Is our girl here?" Stevenson replied that he had sent her back. A short time later, defendant and Hicks entered the room. Defendant was carrying the shopping bag with yellow wrapped packages inside. He placed the bag on the dresser near the Clorox bottle. Barnes and Brown set to work to test the cocaine, while defendant and Hicks stood near the door.

Before the test could be completed, Cunningham heard gunfire. He immediately rolled off the bed onto the floor. Stevenson screamed and landed on top of Cunningham. Cunningham heard two quick shots, then six to eight more shots, followed by the sound of footsteps running out the door. Stevenson got up and exited the room, leaving blood on Cunningham's shirt. When Cunningham got up, he saw Brown sprawled halfway off the bed and Barnes on the floor. Both had been shot. He went to the door to look for Stevenson and saw Barnes's BMW leaving the motel driveway instead. Cunningham went back in the room to gather up his ring and his car keys and drove home in his Jeep. Before leaving, in "a kind of panic," he dropped the yellow wrapped packages into the trash can in the room. Cunningham figured that if the shooters had left the packages in the room, they did not contain cocaine.

Cunningham was correct. Police testing revealed that the powder in the wrapped packages did not contain any controlled substance.

Meanwhile, Brett Johansen, who had been picking up some groceries at the nearby Hughes Market, heard four "muffled booms" and, shortly thereafter, saw Stevenson run out of the motel parking lot. Stevenson was yelling,

"Somebody help me. Please help me," and trying to flag down a car for help. Johansen also saw two African-American men in a silver BMW, tires screeching, come out of the motel driveway towards Stevenson. Johansen, who was across Emerson Avenue, backed up the hill behind the water machines to watch the events unfold. The intersection was very well lit, and the water machines did not block his view at all.

Some cars slowed down as though to help Stevenson, but they sped up and fled when they saw what was going on. The BMW drove into oncoming traffic on Emerson Avenue to chase Stevenson and try to cut him off. Stevenson reversed field and fled, but the BMW executed a 180-degree turn and followed.

When a yellow station wagon slowed down, Stevenson ran up to the driver's window and asked for help. However, the BMW came sliding alongside the station wagon, practically pinning Stevenson in between. The passenger exited the BMW, with his gun in the air. The station wagon then took off, and Stevenson ran away again. The passenger got back in the BMW, which continued the pursuit. When the BMW cut Stevenson off again, he ran into a used car lot, which had a 12-foot fence at the back. The passenger once again exited the BMW and followed Stevenson into the used car lot. Stevenson pleaded, "Please don't kill me." His shoulders were slumped, and it appeared to Johansen that he had given up. The passenger reached out with his right hand and picked Stevenson up, as if they were buddies, and straightened him up. The passenger pointed his gun with his left hand at the center of Stevenson's chest and shot him. Stevenson dropped to the ground. The passenger went back to the BMW, which had been waiting for him, and took off towards the freeway. Stevenson crawled towards the street while Johansen called the police from a nearby gas station.

Although Johansen did not see the faces of the BMW's occupants, he could tell that the passenger was of average height, approximately six feet tall and 150 to 160 pounds. Defendant's driver's license indicated that he was six feet one inch tall and 170 pounds. Johansen also described the passenger's hair as being "about an inch, inch and a half" long and "nappy"—as defendant's hair was at the time. Johansen testified that the driver was burlier than the passenger and had shorter hair. This description was consistent with Hicks, who was five feet nine inches tall and 310 pounds and had hair that was shorter than defendant's.

Hicks, moreover, was right-handed. The parties stipulated that defendant was left-handed.

*Police Investigation*

Officer Lori Fishburn of the Monterey Park Police Department arrived at the intersection of Atlantic Boulevard and Emerson Avenue around midnight, one to two minutes after receiving the dispatch. She was flagged down by Stevenson, who came out of the used car lot and fell to the ground, bleeding. When Fishburn asked what had happened, frothy blood came out of Stevenson's mouth and then he died. Johansen directed Fishburn to the Best Western motel, which was next to the used car lot, and she followed the blood drops to room 120. The door was open. Two African-American males, Landis Barnes and Albert Brown, were dead. A Clorox bottle was on the dresser. There were bullet holes in the wall. A white powdery substance packaged like cocaine was in the trash can. There was no money in the room, other than the cash in the victims' possession, and no black athletic bag. Nor were there any guns.

Meanwhile, Maribelle Santiago had become concerned that Stevenson had not called and decided to return to the motel. As she drove back, she saw Stevenson's body on the corner. She called Stevenson's girlfriend and brother-in-law while she watched from across the street and saw the police arrive.

Police investigators found expended bullets underneath the carpeting and inside the wall of the motel room, a blood trail leading to a bullet near the motel swimming pool, and a bullet in a puddle of blood in the used car lot. A firearms expert examined the expended bullets and fragments and determined that at least two different guns had been used in the motel room shooting.

An autopsy revealed that Albert Brown had suffered three gunshot wounds: one in his head and two in his chest. The head wound had been caused by a medium-caliber lead bullet. Stippling around the head wound indicated that the gun had been fired within six to 18 inches of Brown's face. The chest wounds were caused by copper-jacketed lead bullets and exhibited no stippling. Landis Barnes suffered a bullet wound to the brain, which was fatal, and two chest wounds. Tenoa Stevenson suffered five gunshot wounds, three of them fatal. The front chest wound exhibited markings consistent with a muzzle stamp.

During a police interview on June 1, 1988, Cunningham identified "Eric" as having been present at the motel. Further police investigation uncovered defendant's last name. Cunningham then identified defendant's photograph in a "six-pack mug book show-up" and subsequently identified Hicks as well.

On June 8, 1988, police arrested defendant and interviewed him at the Lynwood Sheriff's station. Defendant denied being at the motel. He said that

Barnes had come by his house with what appeared to be four kilos of cocaine and had offered him $3,000 to provide "protection" during the drug deal, but he had refused to participate and heard later on the news that Barnes had been killed.

The next day, defendant was allowed to talk with his girlfriend, Tarsha Smith, at the Monterey Park Police Department, but their conversation was secretly taped. During this conversation, defendant discovered that Smith had undermined his alibi by telling police that he *had* been at the motel during the shootings. Defendant then requested to meet again with the police. During that police interview, defendant admitted that he had not told the truth during the first interview and offered a new account. He said that Barnes and a man named "Steve"[2] from Nickerson Gardens had asked him to accompany them to a drug transaction and that Barnes had driven him to the motel and had rented a room. Defendant denied ever entering the room and said he instead waited in a phone booth across the courtyard while Barnes and some men who arrived in a black dually truck and a Jeep went into the motel room. He also said he fled after hearing gunshots. Under further questioning, however, defendant admitted entering the motel room to carry the drugs from Barnes's car to the dresser. Barnes then asked him to act as a lookout. After defendant heard the gunshots, he saw one man run out of the motel room and drive off in Barnes's BMW. He denied seeing Santiago arrive with the money and denied driving off in the BMW. Later in the interview, defendant admitted that he had stayed in the motel room until the "girl" drove up with the money; that he had left when Stevenson and the others discussed how to test the cocaine's purity; that one man drove off in the Jeep and one in the BMW after the shots were fired; and that he took the bus home. He denied stopping at the 7-Eleven or accompanying Stevenson to Santiago's car. He also denied being in Barnes's BMW.

After admitting that he still had not told the police the truth, defendant said that he had seen the four wrapped packages in the trunk of Barnes's car the night before the murders; that Hicks had started shooting when Barnes cut into one of the packages to test the cocaine; that Hicks had used two guns, a chrome one and a blue steel one; that Hicks had made him drive Barnes's BMW back to Lynwood; and that Hicks had only then told him the packages contained flour, not cocaine. But, under further questioning, defendant claimed that Barnes had offered him $3,000 to assist in a drug deal, which he had declined because he did not have a gun; that the next night Barnes nonetheless picked him up and brought him to a 7-Eleven, where he saw Cunningham in a Jeep and two other men in a black dually truck; that they all

---

[2] When investigators asked defendant for "Steve's" last name, defendant said he thought he could obtain it if he was permitted to make some phone calls. After some calls, defendant identified the man as Steve Hicks.

went to the Best Western motel, where Barnes rented a room; and that Hicks told him at that point the packages contained flour. When Barnes was about to cut open the packages, Hicks jerked defendant backwards, pulled out a gun, and started shooting. Brown was the first one hit, then Cunningham fell to the ground, followed by Stevenson. During the volley of shots, Hicks pulled out a second gun, a chrome revolver. Defendant walked towards Barnes's BMW, since he still had the keys from opening the trunk, but Hicks got in the passenger's side and told defendant to get in the car and drive. On the way out, they saw Stevenson running on the street. Hicks ordered defendant to follow Stevenson and try to cut him off, and defendant did so. Eventually, Hicks got out of the car and chased Stevenson into a used car lot. Defendant said he knew Hicks from the neighborhood.

On June 15, 1988, defendant again waived his *Miranda*[3] rights and gave yet another statement. In this one, he said that Barnes came to his house the night before the murders and showed him the four wrapped packages in the trunk; that they had a conversation as to whether the packages looked authentic; and that they then rewrapped them with duct tape. He claimed that when he and Hicks were retrieving the kilos from the trunk of Barnes's car at the motel, Hicks said that he was "fixing to jack those niggers." Defendant also stated that after the shooting, Hicks pointed the gun at him and said, "Drive the car, and do as I say, and you will not get hurt." Then, when Hicks saw Stevenson running away from the motel, he said, "Drive and get him."

Defendant told the police that he had previously been untruthful because he was afraid of what Hicks might do to him or his family. But when he was confronted by Cunningham's statements, he eventually corroborated everything, except "that he did not admit to having a gun in his hand."

On August 8, 1989, Detective Larry Kallestad of the Los Angeles Police Department received a phone call from a woman identifying herself as Eula Roberson, who left her address and phone number. Roberson said she had some information to convey to police detectives. In particular, she said that she had spoken to "E Money," who had admitted killing three people in Monterey Park. When Kallestad asked whether she knew this person by any other name, she replied, "Eric." She asked to be picked up in an unmarked car and interviewed somewhere other than her home.

At trial, Roberson denied telling police that "E Money" had admitted killing three people in Monterey Park and denied that she had ever had a conversation with defendant about any murders in Monterey Park. On the other hand, Roberson lived in Lynwood, knew defendant from the neighborhood, and admitted that defendant and Barnes often visited her nephews and

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

son. Hicks, too, visited from time to time. She denied knowing defendant by the name "E Money," but admitted calling the police in August 1989, leaving her name, address, and phone number, and asking to be interviewed away from her house.[4] She also admitted that defendant was the only "Eric" she knew.

### Defense Case

Defendant, who was 18 at the time of the murders, testified at trial. Defendant said that he had known Barnes for 10 years and had known Hicks for five, although he had generally tried to steer clear of Hicks.

Defendant said that Barnes came to his house on the evening of May 23, 1988, to ask defendant to transport the goods for a drug deal. Cunningham was also present, but defendant did not know who he was at that time. Defendant, himself a drug dealer, told Barnes to come back when he was ready. Barnes returned around 4:00 p.m. the next day and told defendant the deal was still "on" for that night and said he would pay defendant $3,000 for transporting the drugs. When defendant asked why Barnes wanted him to drive his Beetle, Barnes explained that an African-American male driving a BMW, like Barnes's car, was more likely to be pulled over than an African-American male driving a Beetle, like defendant's car. Barnes showed defendant the wrapped packages in the trunk. They looked "funny" to defendant and felt softer than other kilos he had seen. Barnes said they had been opened once and needed to be rewrapped.

Barnes returned to defendant's house around 10:30 p.m. Defendant asked whether Barnes had a gun. Barnes said he did not. Defendant said he was not going to go, but Barnes said "everybody knows one another, and it's not like that." When defendant came outside, he saw that Hicks was in Barnes's car and assumed that Hicks must be the supplier of the drugs. Barnes brought the wrapped packages over to defendant's Beetle and drove off. Defendant followed.

When they arrived at the 7-Eleven, Barnes parked next to Stevenson and Brown, who were next to Cunningham's Jeep. Barnes got out to talk to Stevenson, while defendant stayed in his car. Hicks and Barnes then came to defendant's car and told him that Stevenson wanted to conduct the transaction at the motel. Barnes told defendant to leave his car at the 7-Eleven and to ride with Cunningham. Hicks took the wrapped packages out of the car.

During the ride with Cunningham to the motel, Cunningham told defendant that if they kept doing business together, defendant would make a lot of

---

[4] The record does not reflect whether this interview ever took place.

money. After Barnes got the room key from the office, he entered room 120, followed by Stevenson, Brown, and Cunningham. Hicks remained inside Barnes's BMW, while defendant stood in front of it. After Barnes conferred separately with Hicks and Stevenson, Stevenson said he needed to make a phone call. When he came back, he said the money was "on the way." A car then pulled up, and Stevenson talked to the woman who was driving. Stevenson pulled out a black bag of money, showed it to Barnes, and then put it back in the car. After the car left, Barnes gave defendant his car keys to take the wrapped packages from the trunk to the motel room.

Defendant set the bag on the dresser. Brown and Barnes were discussing who was going to test its purity. As the testing was about to begin, Hicks pulled defendant back by his collar and shot Brown. Hicks had a black revolver in his left hand, even though he was right-handed. Defendant turned around and ran away as the gunfire continued. Defendant was heading towards the front of the motel when he realized he had Barnes's car keys, so he went back to the parking lot. As he was opening the car door, Hicks jumped in the passenger side. He had a different gun in his hand this time, a chrome one. He pointed the gun at defendant and told him to drive. Defendant drove out of the motel lot, against traffic, in pursuit of Stevenson, who was standing near a big yellow car. Hicks made defendant pursue Stevenson in the car until Stevenson ran into the used car lot, at which point Hicks got out of the car and told defendant to stay put. Hicks returned to the car about 45 seconds later and directed defendant to drive to the 7-Eleven, where defendant got into his own car and drove home. Defendant talked on the phone to his girlfriend, Tarsha Smith, about what had happened until 5:00 a.m. He claimed he discovered the drugs were fake only when a friend told him so after the incident.

Defendant admitted that he had been untruthful in his police interviews on June 8 and 9, 1988, and that the officers had testified accurately at trial as to his prior statements. He also admitted that he had known all along that "Steve's" last name was Hicks and that he had not needed to make any phone calls to discover that fact. He further admitted leading police on a wild goose chase and falsely claiming he had sold his Beetle when they asked to inspect it. He lied to the police because he figured the less he told them, "the less they would know, and they would just let me go." Defendant also was impeached with his prior convictions for murder, attempted murder, and assault with a firearm.

Defendant also admitted being untruthful with his girlfriend, Tarsha Smith, in telling her that he did not know who the shooter was and in telling her, after his initial police interview on June 8, that he had told the police everything he knew. When Smith informed defendant that she had already

told police that defendant, contrary to his original statement, *had* been at the motel, defendant asked to meet with police investigators again.

Smith testified that defendant and Barnes were friends.

The defense sought to impeach Cunningham's testimony by reference to his denial to police of any knowledge about Stevenson's death when questioned on May 25, 1988. The defense sought to impeach Santiago's testimony by reference to her initial statements denying any knowledge of what happened at the motel and her description of herself in a police interview as Stevenson's lover. And the defense sought to impeach Johansen's testimony by reference to his earlier estimate that the BMW's passenger was five feet seven inches tall and by reference to the written report of the investigating officer, Detective David Corrigan, that Johansen had said the passenger grabbed Stevenson with his *left* hand and held the gun in his *right*.[5]

A defense investigator took photographs of the intersection of Atlantic and Emerson on January 9, 1993, about four and one-half years after the crime. He was three inches shorter than Johansen, and his photographs therefore did not reflect what Johansen saw. The investigator nonetheless believed that Johansen's view could have been blocked by the water machines, cars in the parking lot, vehicular traffic, and trees. Detective Corrigan, however, testified that the structure surrounding the water machines had not been in existence at the time of the murder, that the water machines themselves were much smaller at that time, that there were no cars in the parking lot a few hours after the murder, that the trees had been much smaller and were more like shrubs at the time of the murder, and that there would have been less traffic around midnight, the time of the murder. Indeed, a videotape Corrigan made the morning after the murder showed that there were very few obstructions.

*Penalty Phase*

Around 3:30 p.m. on August 6, 1989, defendant approached Dwayne Reed, who was filling up his car at a gas station at the corner of Imperial and Main in Los Angeles. Defendant, who was carrying a towel in his hand, said he had heard that Reed was going to "smoke" him. Reed replied, "It's not like that. Everything is cool." Defendant then said, "I can't trust you" and pulled a gun out from under the towel. Reed tried to flee but tripped over the hose and fell. Defendant shot Reed fatally in the head at point-blank range.

---

[5] Corrigan explained that he spoke with Johansen for only 15 minutes at the scene, when things were "very hectic," prepared his report 30 to 48 hours later, and did not show the report to Johansen until December 1992, at which point Johansen informed him the report was in error and that the passenger had shot the victim with his left hand.

Reed's aunt, Eula Roberson, had believed defendant and Reed were friends, since defendant used to come over to her house once or twice a week to see Reed and her son.

### Mitigating Evidence

Members of defendant's family testified about the family's history and defendant's childhood.

Defendant's mother, Diane, started running away from home when she was 15. Diane and her mother did not get along well. Some family members testified that Diane was promiscuous from a young age. Jeanette Dozier, defendant's great-aunt, testified that Diane claimed to have been a prostitute. When Diane became pregnant with defendant at the age of 17, while she was still in high school, her mother beat her with an extension cord. Diane's aunt, Jeanette Dozier, testified that Diane did not want to have the baby, once tried to abort the pregnancy herself, and did not take care of defendant after he was born. That responsibility fell to her mother, Jessie Compton, and her sister, Joanne Merritt. Defendant never knew who his father was.

Diane was described as "mean" and told defendant that she did not want him. Compton and Merritt, on the other hand, loved defendant "to death." Defendant's needs were provided for, he never needed to get a job while in school, and he was even given a Volkswagen Beetle as a high school graduation present.

When defendant was four years old, Diane married William Heard, who regularly beat her. Although the beatings did not occur in front of defendant, he saw her bruises and welts. Jessie Compton testified that Heard also beat defendant, but defendant's favorite aunt, Joanne Merritt, denied it. Diane, who soon divorced Heard, also beat defendant when she had been drinking too much. Compton testified that the beatings were so severe that defendant sometimes lost consciousness, but no one ever took him to the hospital.

Defendant's uncle, Donald Dennis, was stabbed to death when defendant was 15 years old. Defendant's great-aunt, Mae Rossum, thought Donald might have been dealing drugs. Defendant had been very close to his uncle, who had been a role model for him, and some family members testified that defendant changed for the worse after Donald died. Others said that defendant did not change that much. Carlos Hilliard, another uncle, testified he had a sense that defendant was "going the wrong way" after Donald's death. Defendant was spending time with drug dealers, and Hilliard did talk with defendant about it. Various family members testified that defendant and Barnes were good friends.

Diane was raped in early 1988. She stopped working and developed a drinking problem but never told defendant what had happened.

Defendant went to church every Sunday when he was in elementary school. When he was in high school and getting beaten up and having his lunch money taken, Jessie Compton's husband, Charles Compton, showed defendant how to defend himself. Neither Diane nor her mother had ever known defendant to carry a gun or to act in a violent manner. However, Diane said she had been told by police that defendant had a gun on his person when he was arrested.

When defendant was 17, he took care of his great-uncle, Jim Rossum, who had suffered a stroke. For about three months, defendant went to the Rossum home and stayed each day for four hours while his great-aunt was at work.

Defendant was skilled at drawing and sketched a portrait of his six-year-old daughter, Erica, for his mother's birthday while he was in jail awaiting trial. Erica testified that she loved defendant and did not want him to die.

Defendant had suffered only one disciplinary violation during his incarceration, and that was for being in an unauthorized area.

## II. JURY-SELECTION ISSUES

On their juror questionnaires, six members of the venire who eventually served on the jury answered something other than an unqualified "yes" to question 93C ("Do you believe that if a person is sentenced to death, he will actually be put to death?") or question 93D ("Do you believe that if a person is sentenced to life without parole, he will actually spend the rest of his life in prison?"). Following *Hovey*[6] voir dire—in which each prospective juror stated that, in the event the case proceeded to a penalty phase, he or she could assume that the punishment selected would actually be carried out—these six were allowed to remain in the venire. Defendant, who challenged only one of these prospective jurors for cause below, now alleges the trial court erred in failing to excuse all six of these jurors for cause. He also claims that defense counsel was ineffective in failing to exercise a peremptory challenge to remove one of these jurors, that the trial court erred in failing to instruct the jury in the penalty phase to assume that the punishment selected would be carried out, and that defense counsel was ineffective in failing to request such an instruction at the penalty phase. His claims invoke the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. We reject these claims in their entirety.

---

[6] *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301].

As to defendant's claim that the trial court erred in failing to excuse the six jurors for cause, we note that, with one exception, defendant failed to challenge these jurors for cause at trial. Accordingly, defendant failed to preserve any appellate challenge to five of these jurors. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 48 [17 Cal.Rptr.3d 710, 96 P.3d 30]; *People v. Seaton* (2001) 26 Cal.4th 598, 634 [110 Cal.Rptr.2d 441, 28 P.3d 175].) Although defendant did challenge Juror K.B. for cause below, he nonetheless failed to preserve this challenge for appeal. Defendant exercised only eight peremptory challenges, leaving him with 12 remaining when he accepted the jury. (Code Civ. Proc., § 231, subd. (a).) " 'To preserve a claim of error in the denial of a challenge for cause, the defense must exhaust its peremptory challenges and object to the jury as finally constituted.' [Citation.] Defendant did neither." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 487 [117 Cal.Rptr.2d 45, 40 P.3d 754].)[7]

■ Even if the claim were cognizable, defendant would not prevail. Each of these six jurors stated that, in choosing between death and life imprisonment without the possibility of parole, he or she could properly assume that the punishment selected would actually be carried out. There is no conflict or inconsistency between a juror's statement of fact that the punishment selected may not necessarily be carried out and the juror's statement that, for purposes of the trial, he or she would assume the punishment selected would be carried out. (*People v. Kipp* (1998) 18 Cal.4th 349, 378 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) The responses provided by each of these jurors during voir dire thus supplied ample evidence of his or her impartiality and capacity to serve.

■ We also reject, on this record, defendant's claim that his attorney was ineffective in failing to exercise a peremptory challenge against Juror K.B. once the challenge for cause proved unsuccessful. " 'Because the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process.' " (*People v. Freeman* (1994) 8 Cal.4th 450, 485 [34 Cal.Rptr.2d 558, 882 P.2d 249].) In this instance, we observe that Juror K.B. had himself been the victim of an illegal police search. He also said that he would not be bothered by viewing unpleasant photographs of the deceased, that he did not believe a police officer's testimony was necessarily more believable than that of any other witness, and that he believed "mistakes do happen" in charging an individual with a crime. (See *People v. Bemore* (2000) 22 Cal.4th 809, 839 [94 Cal.Rptr.2d 840, 996 P.2d 1152].)

---

[7] For the same reason, defendant failed to preserve for appeal his claim the trial court erred in failing to excuse for cause two prospective jurors who did not even serve on his jury. (*People v. Hillhouse, supra,* 27 Cal.4th at p. 487.) We also reject this claim on the merits, since " '[d]efendant could not possibly have suffered prejudice as a result of the court's refusal to excuse them . . . .' " (*Id.* at pp. 487–488.)

Defendant claims next the trial court erred in failing to instruct the jurors at the end of the penalty phase to assume that the penalty selected will be carried out. He acknowledges, as he must, that we have not required such an instruction in every penalty phase because of the concern that such an instruction "may unnecessarily raise questions in the jurors' minds." (*People v. Kipp, supra,* 18 Cal.4th at pp. 378–379.) He nonetheless urges that such an instruction should have been given in *this* case because of the trial court's awareness of the jurors' concerns on this topic based on their responses to the jury questionnaire. Although it would not have been improper to have so instructed the jury during the penalty phase instructions (*id.* at p. 378), as defendant now urges, we find the trial court did not abuse its discretion by ensuring the jurors were instead informed during voir dire to assume that whatever penalty was selected would be carried out.

Defendant relies on *People v. Hines* (1997) 15 Cal.4th 997 [64 Cal.Rptr.2d 594, 938 P.2d 388] (*Hines*) and *People v. Davis* (1995) 10 Cal.4th 463 [41 Cal.Rptr.2d 826, 896 P.2d 119] (*Davis*), but neither case helps him. Indeed, in *neither* case was a cautionary instruction included among the penalty phase instructions. In *Hines*, the jury submitted questions once deliberations had already begun as to whether a sentence of death or of life imprisonment without the possibility of parole could be reduced. (*Hines, supra,* 15 Cal.4th at p. 1071.) The trial court consulted with counsel and then "correctly instructed the jury that the Governor had the power to commute either a death sentence or a sentence of life without possibility of parole, but that it would be 'improper' and 'a violation of your duty as jurors' to consider the possibility of a pardon or commutation in determining the appropriate penalty." (*Id.* at p. 1073.) In *Davis*, the foreperson submitted a note after the jury had been instructed (but before deliberations had begun) as to whether either punishment, death or life imprisonment without the possibility of parole, would actually be enforced. We found no error when the court instructed the jury the next morning that it was to assume the punishment selected would be carried out. (*Davis, supra,* 10 Cal.4th at pp. 546–548.)

What is significant in both cases for our purposes is that the trial court dealt *promptly* with evidence that the jury had concerns whether either punishment, death or life imprisonment without the possibility of parole, would actually be carried out. Here, unlike in *Hines* and *Davis*, the trial court learned of the jurors' concerns at an early stage, during voir dire. The jurors were then promptly instructed, either by defense counsel or by the court itself, to assume that either punishment would be carried out. (*People v. Thompson* (1988) 45 Cal.3d 86, 129 [246 Cal.Rptr. 245, 753 P.2d 37] ["During voir dire virtually all the jurors were informed, either by defense counsel or through general instructions from the court, that they should assume the sentence they voted for, whether death or life without possibility of parole,

would be carried out"].) Indeed, several of the jurors also received an explanation *why* the assumption was so important.

Moreover, nothing that occurred subsequently at the trial raised an issue as to whether either punishment would actually be carried out. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 76 [14 Cal.Rptr.2d 133, 841 P.2d 118].) Rather, the jury was instructed that it "must now determine which of said penalties shall be imposed on the defendant"; that, in doing so, it shall consider and be guided by the statutory aggravating and mitigating factors; and that it was "not allowed to consider any other facts or circumstances as the basis for deciding that the death penalty would be an appropriate punishment in this case." Also, both attorneys stressed the gravity of the jury's decision. Under these circumstances, the trial court did not abuse its discretion in responding to the jurors' concerns during voir dire rather than waiting until the jury instructions at the end of the penalty phase. (See *People v. Smithey* (1999) 20 Cal.4th 936, 1009 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [trial court "has discretion to determine what additional explanations are sufficient to satisfy the jury's request for information"]; *State v. Anderson* (2001) 65 Conn.App. 672 [783 A.2d 517, 521–523]; cf. *Penry v. Johnson* (2001) 532 U.S. 782, 799–801 [150 L.Ed.2d 9, 121 S.Ct. 1910] [expressing skepticism that "convoluted" statements during voir dire could cure conflicting sets of instructions].)

For the same reason, we reject defendant's claim that trial counsel was constitutionally ineffective for failing to request the jurors be reinstructed at the end of the penalty phase. Additionally, as stated above, counsel may well have wanted to avoid highlighting the possibility that a death sentence might not be carried out. (*People v. Kipp, supra*, 18 Cal.4th at pp. 378–379.)

### III. Guilt Phase Issues

#### A. Alleged Prosecutorial Misconduct

Defendant contends that prosecutorial misconduct "permeated the guilt phase trial" in violation of his due process right to a fair trial, privilege against self-incrimination, right to an impartial jury, and right to a reliable determination of guilt under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and article I, sections 1, 7, and 15 of the state Constitution.

■ "A prosecutor's conduct violates the federal Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11]; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181

[91 L.Ed.2d 144, 106 S.Ct. 2464]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S.Ct. 1868].) 'Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under [California] law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' (*Morales*, at p. 44.) In general, ' " 'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety.' " ' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1184–1185 [24 Cal.Rptr.3d 112, 105 P.3d 487].) "In the absence of a timely objection the claim is reviewable only if an admonition would not have otherwise cured the harm caused by the misconduct." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1146 [124 Cal.Rptr.2d 373, 52 P.3d 572].)

### 1. *Opening Statement*

Defendant argues first that the prosecutor's opening statement was improper in that it referred to inadmissible hearsay statements by Barnes and Stevenson, misstated what the evidence would show, and was unduly argumentative. We disagree. As to Barnes's and Stevenson's out-of-court statements, the trial court appropriately warned the prosecutor that the admissibility of that evidence was "an issue that we will resolve in this proceeding." Although we agree with the trial court that "the safer and preferred path is to avoid making those references" until the issue was resolved, we discern no possible prejudice when, as defendant concedes, these out-of-court statements were ultimately admitted under the coconspirator exception at trial. As to whether the prosecutor misstated the legal significance of defendant's admissions to police, defendant forfeited the claim by failing to object on this ground below. Moreover, the trial court's instructions before opening statement and again before closing argument that the attorneys' statements were not evidence would have dispelled any prejudice. (*People v. Wrest* (1992) 3 Cal.4th 1088, 1109–1110 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) As to the allegation that the prosecutor's opening statement was unduly argumentative in invoking felony-murder and aiding-and-abetting theories, we note that the trial court sustained the defense objections and admonished the prosecutor. In addition, the prosecutor's argument essentially tracked what was proved at trial. (*United States v. Panza* (2d Cir. 1984) 750 F.2d 1141, 1153.) When combined with the fact that the jury was repeatedly instructed the attorneys' statements were not evidence and the fact that the objectionable comments and jury deliberations were separated by more than six weeks, defendant could not have been prejudiced. (*Frazier v. Cupp* (1969) 394 U.S. 731, 736 [22 L.Ed.2d 684, 89 S.Ct. 1420].)

### 2. *Cunningham's Testimony*

Defendant quotes several passages from the prosecution's direct examination of witness Cunningham and complains the prosecution engaged in prejudicial misconduct because the trial court sustained 34 defense objections, admonished the prosecution 10 times, ordered a response stricken on five occasions, and held nine sidebar discussions. But the critical inquiry on appeal is not how many times the prosecutor erred but whether the prosecutor's errors rendered the trial fundamentally unfair or constituted deceptive or reprehensible methods to attempt to persuade the jury. Defendant makes no effort to describe the unfairness or deceptiveness of the prosecutor's conduct, and our own review does not detect any.

The trial court sustained the defense objection to Cunningham's statement that he "figured these people I didn't know were shooting at us" and ordered it stricken. Inasmuch as Cunningham admitted that he did not see who committed the shooting, the jury would not have interpreted this statement as evidence that defendant (as opposed to Hicks) was the shooter. We also presume the jury obeyed the trial court's admonition to disregard this response. (*People v. Michaels* (2002) 28 Cal.4th 486, 528 [122 Cal.Rptr.2d 285, 49 P.3d 1032].)

Nor do we find it fatal that the prosecutor attempted, unsuccessfully, to inquire into the subject matter of Cunningham's conversation with Maribelle Santiago two days after the murders. We presume the jury obeyed the trial court's instruction that questions posed by the attorneys are not evidence.

Finally, none of the questions to which the court sustained defense objections of "asked and answered" could have prejudiced defendant.

### 3. *Johansen's Testimony*

Over defense objection, the court permitted the prosecution to show defendant's photograph to witness Johansen for purposes of comparing the hairstyle therein to that of the shooter Johansen observed at the scene. After Johansen established that he never saw the shooter's face but that his hair was "nappy," the prosecutor asked, "How would you characterize the defendant's hair as it is today?" Johansen replied, "It looks a little better kept today, but it's still kind of nappy." Defendant did not object to this response, nor did he object when the prosecutor prefaced his next question by saying, "Now, you said that his hair appears to be 'better kept today.'" Defendant did successfully object when Johansen was subsequently asked whether the photographs of defendant "more closely resemble the nappy hair of the shooter." Ultimately, Johansen testified that the hair in the photographs of defendant was "[n]appy" and "[u]nkempt," unlike the hair in the photographs of Hicks.

Because defendant failed to object to Johansen's answer or the prosecutor's followup question, he has forfeited the right to complain on appeal about either one. We also find no reasonable likelihood that the jury would have interpreted either comment as an identification of defendant by Johansen. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].) Rather, Johansen plainly was comparing defendant's hair "today" to the hair in the photographs he had been shown.

Defendant also complains that the prosecutor's examination of Johansen began with "a series of leading questions" on foundational matters. He does not assign any prejudice to this sequence, and none can be imagined. (See *People v. Hayes* (1971) 19 Cal.App.3d 459, 470 [96 Cal.Rptr. 879].)

### 4. *Cross-examination of Defendant*

In a lengthy discussion with extensive quotations from the record, defendant argues that his own cross-examination "was replete with objectionable questions, misstatements of evidence, and attempts to further introduce inadmissible evidence through misrepresentation." As defendant acknowledges, the trial court in each instance sustained the defense objection and admonished the prosecutor. For example, the trial court corrected the prosecution's assertion that defendant had been dealing drugs for a few years (it had actually been only 18 months); deemed argumentative the prosecutor's assertion that defendant had lied when he told Barnes he was willing to be the driver despite not being sure he was even going to participate in the transaction; and deemed speculative the prosecutor's question whether defendant had told the police that people in the neighborhood were blaming him for Barnes's murder. We find no reason to doubt the jury followed the court's instructions distinguishing between evidence and counsel's questions (*People v. Mayfield* (1997) 14 Cal.4th 668, 755 [60 Cal.Rptr.2d 1, 928 P.2d 485]), and (with only two exceptions, discussed below) defendant does not even offer any. Instead, he complains that if such instructions are deemed sufficient, then "as long as the prosecutor did not get away with his misconduct, there can be no prejudicial error." If by "get away" with misconduct, defendant means that the prosecutor's actions did not render the trial fundamentally unfair or result in a miscarriage of justice (see *People v. Hill* (1998) 17 Cal.4th 800, 844 [72 Cal.Rptr.2d 656, 952 P.2d 673]), then he is correct. Whatever methods a trial or appellate court might otherwise use to bring to heel a recalcitrant or incorrigible prosecutor, the federal Constitution does not require (and the state Constitution does not permit) the reversal of a criminal conviction unless the misconduct deprived defendant of a fair trial or resulted in a miscarriage of justice. (See *People v. Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396].) Here, as the trial court explained in denying defendant's motion for a mistrial, the prosecutor's questions were not improper "over and above being in violation of the Evidence Code."

Two portions of the cross-examination merit closer attention, however.

In exploring whether defendant could have obtained a gun after Barnes invited him to participate in the drug deal, the prosecutor asked whether defendant could have obtained a gun in his neighborhood. Defendant agreed that he could have done so. The prosecutor then asked whether defendant could have obtained a gun in "the area of [his] car" and, when defendant said, "no," asked whether defendant kept a gun in his car, had ever kept a gun there, and whether a gun had been found in his car when he was arrested. At this point, the defense objected, and the parties conferred at sidebar. The court observed that "there has to be some evidence of the fact there was a gun in the car when he was arrested . . . for you to be asking these questions" and asked for an offer of proof. After reviewing the arrest report, defense counsel pointed out that the gun had actually been recovered from defendant's person. The court granted the defense motion to strike and informed the jury that "the questions and answers related to a gun being found in the defendant's car have been stricken. You are instructed to disregard them as though they were never asked or answered." Although the prosecutor plainly erred in posing the question, defendant was not prejudiced. Not only was the jury promptly instructed to disregard the questions and answers, but defendant himself admitted that a gun had been "available" to him "at a moment's notice."

Defendant also complains that while inquiring about his interview with police on June 9, 1988, the prosecutor asked, "And you are saying, now, that all those statements you gave were lies?" Defense counsel objected on the ground that it misstated the evidence, in that "a great number of statements made in the course of those interviews were perfectly true." The trial court judge agreed that the police witnesses had testified "that some of the statements were truthful" and that characterizing them "in the argumentative way you have been doing with this witness is not appropriate. Stop it, now." When cross-examination resumed, the prosecutor established without objection that defendant told the police "a whole lot of lies." The difference between the hyperbolic accusation that "all" of defendant's statements were lies and defendant's concession that he told a "whole lot of" lies could not have been prejudicial.[8]

---

[8] Defendant also complains that the prosecutor attempted in rebuttal to ask Detective Corrigan about the lighting conditions at the used car lot during a recent visit, even though the court had instructed him at sidebar not to explore that topic. Inasmuch as defense counsel's objection was sustained before the prosecutor was even able to finish the question, and the prosecutor immediately moved on to a different topic, it is difficult to discern any prejudice.

### 5. Doyle *Error*

Defendant gave statements to police during an initial interview on the morning of June 8, 1988, a lengthy interview on June 9, and an interview on June 15. The prosecutor elicited this sequence and the fact that, in each instance, defendant was advised of his *Miranda* rights and waived them. The prosecutor also elicited from Detective Corrigan the fact that police attempted to interview defendant on the afternoon of June 8, but defendant refused to waive his rights. At a sidebar immediately following that exchange, defense counsel asked for a mistrial on the basis of *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] (*Doyle*). The prosecutor explained that he did not plan to "comment" on the invocation and had brought it up only because defendant "gave so many statements and he was *Mirandized* so many times" that defense counsel had earlier indicated "they were confused as to which instance this witness is talking about." The trial court took the motion under submission and instructed the prosecutor not to ask any further questions in this area. Later that day, the prosecutor asked the jury be admonished concerning the invocation, but defense counsel complained that such an admonition would only exacerbate the problem.

Later, in reviewing this sequence of interviews with Lieutenant Maynard Merkt, the prosecutor asked about the interview on the afternoon of June 8 and whether Merkt had obtained any information from defendant at that time. Merkt said, "No, sir." At sidebar, defense counsel again asked for a mistrial. The prosecutor said the question was merely for purposes of "clarification." The court observed there was no relevance "to an interview that didn't happen because the defendant invoked his privilege" and warned it would consider this latest exchange in connection with the original motion for a mistrial.

At the hearing on the motion for a mistrial, the People conceded that *Doyle*[9] applied, but argued that defendant suffered no prejudice. Defendant continued to insist that a jury admonition "would simply aggravate the problem." The trial court denied the motion for a mistrial, expressing doubt that the jurors "are going to do much with it," and directed counsel not to mention, refer to, or question any witness about defendant's invocation again.

We agree that the error was harmless. Although the jury could in theory have relied on defendant's unwillingness to speak to the police on the

---

[9] *Doyle, supra,* 426 U.S. at page 618, held that "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."

afternoon of June 8 to infer that he was fabricating a defense, there is no reasonable possibility the jury actually did so, inasmuch as defendant gave police concededly false versions of the circumstances surrounding the murders both before and after his invocation. The problem with defendant's trial testimony was not that the jury heard that he once invoked his *Miranda* rights, but that he repeatedly provided in the other interviews untrue accounts of his involvement in the murders. Indeed, defendant's invocation of his *Miranda* rights was both cumulative of—and inferior to—the other evidence indicating that he had fabricated the account he eventually provided during police interviews and reiterated at trial. For that reason, and because the prosecutor never again mentioned the invocation during trial or closing argument (see *U.S. v. Whitehead* (9th Cir. 2000) 200 F.3d 634, 639), we conclude that these two fleeting references could not have affected the jury's verdicts in this case. (*People v. Earp* (1999) 20 Cal.4th 826, 857–858 [85 Cal.Rptr.2d 857, 978 P.2d 15]; cf. *Gravley v. Mills* (6th Cir. 1996) 87 F.3d 779, 788 ["From the beginning of its own case, through the cross examination of the defendant, up until the culmination of its final argument, the state consistently and repeatedly sought to make impermissible references to Gravley's silence after his arrest"].)[10] For the same reason, we find the trial court did not abuse its discretion in denying a mistrial. (*People v. Williams* (1997) 16 Cal.4th 153, 251 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

### 6. *Opinion Testimony That Defendant Lied During His Interrogation*

Detective Merkt recounted the statements defendant made during the lengthy interview on June 9, 1988. At the outset of that interview, defendant admitted that the version he had provided the previous day was untruthful. In particular, he admitted that he had accompanied Barnes to a motel in Monterey Park, but he claimed that he waited at a phone booth across the courtyard while the other men entered the room. He also said he fled on foot after the shots were fired and went home. When the prosecutor asked Merkt how he would characterize this new account, defendant objected that the question was "vague." After the trial court overruled the objection, Merkt testified that he believed this statement, too, was untruthful, in that it was inconsistent with the statement of other witnesses and with defendant's earlier

---

[10] Although the trial court had stated its intention to instruct the jury concerning defendant's invocation of his *Miranda* rights in conjunction with CALJIC No. 2.60 (Defendant Not Testifying—No Inference of Guilt May Be Drawn), the prosecutor and defense counsel agreed at the instruction conference that CALJIC No. 2.60 need not be given. No mention was made of a special instruction concerning defendant's *Miranda* invocation, nor was such an instruction given to the jury. At the hearing on the new trial motion, defense counsel testified that their decision to forgo a cautionary instruction was tactical. Accordingly, any claim arising from the omission of such an instruction is barred under the invited-error doctrine. (*People v. Davis* (2005) 36 Cal.4th 510, 567 [31 Cal.Rptr.3d 96, 115 P.3d 417].) Defendant also could not have been prejudiced by the omission.

statement. Defendant now claims it was misconduct for the prosecutor to solicit inadmissible opinion testimony from Merkt concerning defendant's truthfulness.

Defendant, who neither objected to the prosecutor's question on this ground below nor moved to strike Merkt's response, has forfeited the claim of prosecutorial misconduct. (Evid. Code, § 353, subd. (a).) Even if we were to assume the claim was cognizable and Merkt's opinion concerning the truthfulness of defendant's statement was inadmissible (see *People v. Stitely* (2005) 35 Cal.4th 514, 546–547 [26 Cal.Rptr.3d 1, 108 P.3d 182]), defendant could not possibly have been prejudiced, inasmuch as he himself admitted this version was untruthful.

### 7. *Closing Argument*

Defendant challenges several statements made by the prosecutor in closing argument, but none of them evidences misconduct warranting a new trial. Indeed, except for one instance (which is identified below), defendant forfeited these claims by failing to object or request an appropriate admonition.

a. The prosecutor's closing argument focused on two questions: whether defendant knew "the dope was bunk" and whether defendant fired a gun. In arguing that the jury must convict defendant of the felonies and the murders if it answered either of these questions in the affirmative, the prosecutor adopted a strategy that was not difficult to follow: If defendant knew the drugs were "bunk," then he would have anticipated a confrontation with the buyers as soon as their testing discovered that fact, would have understood that he needed to seize their money before they could test the drugs, would have recognized that he and Hicks would be outnumbered by the other parties to the transaction, and therefore would have relied on the use of force (whether his or Hicks's) to complete the robbery of approximately $50,000. Under this scenario, which depended only on the lone controversial assumption that defendant knew the drugs were "bunk," defendant was guilty either as a direct perpetrator or as an aider and abettor of all charged crimes. Similarly, if defendant fired his weapon, then—in the absence of any evidence that he fired it in self-defense, that he was provoked to fire it by circumstances completely unrelated to the drug transaction, or that any of the murders were unrelated to the others—he must have been aware the drugs were "bunk" and he was once again guilty as either a direct perpetrator or as an aider and abettor of all the crimes. Thus, in neither instance did the prosecutor contend that either of these facts *alone* warranted a conviction, and we find no reasonable likelihood the jury understood the prosecutor to make such an argument. (*People v. Clair* (1992) 2 Cal.4th 629, 663 [7

Cal.Rptr.2d 564, 828 P.2d 705].) Rather, the prosecutor argued that either fact, combined mainly with uncontroverted facts in the record and inferences therefrom, would lead to a guilty verdict. This was not error.

b. Defendant complains next that the prosecutor impermissibly relied twice on defendant's prior convictions for murder, attempted murder, and assault with a firearm to argue his bad character and propensity to commit the offenses charged. We disagree with defendant's characterization of the argument.

One of the themes of the prosecutor's opening summation was that defendant was a liar. To support that allegation, the prosecutor pointed out that defendant had lied to the police several times, that he had lied to his girlfriend, and that he had lied on the stand as to why he had lied to the police. Finally, the prosecutor relied on defendant's prior convictions, which had been admitted for purposes of impeachment: "He changes his story constantly. You can't believe him. [¶] He says he didn't have a gun and he didn't shoot anybody. Yet, you know that when he was on the stand, he admitted he had been convicted of murder. [¶] He has been convicted of attempted murder, and he has been convicted of assault with a firearm, and he tells you that he did not have a gun that night and he didn't shoot anybody? [¶] You cannot believe him, ladies and gentlemen." In light of the court's instruction to the jury that a witness's prior felony convictions could be "considered . . . *only* for the purpose of determining . . . believability," it is not reasonably likely the jury interpreted the prosecutor's argument to suggest that defendant was guilty merely because of his prior crimes—a conclusion bolstered by the failure of defense counsel to object to it. Such an omission indicates that the potential for prejudice that defendant has now identified "was not apparent to one on the spot." (*Lowenfield v. Phelps* (1988) 484 U.S. 231, 240 [98 L.Ed.2d 568, 108 S.Ct. 546].)

In closing argument, the prosecutor again brought up defendant's prior convictions: "And finally, after further argument, [defense counsel] says, 'Well, actually, the reason he lied to the police is because . . . he's scared of Steve Hicks, and he didn't want to incriminate him.' [¶] Now, come on. This guy is not afraid of Steve Hicks. He's not afraid of Steve Hicks. The defendant is a convicted murderer. He has been convicted of attempted murder. He has been convicted of assault with a firearm. He's not afraid of Steve Hicks. Steve Hicks is probably afraid of him." Once again, we are skeptical that the jury would have understood the prosecutor to urge them to convict "because Hinton had murdered before and, therefore, he must have murdered again." Rather, the prosecutor was plainly relying on the prior convictions to rebut defendant's claim that he had acted under the duress of Hicks's threats. But, as defense counsel recognized by promptly objecting,

this exceeded the purpose for which the prior convictions had been admitted, and the trial court sustained the objection. The court also instructed the jury that the argument had been stricken and admonished them to disregard it. We presume the jury followed the court's instructions. (*People v. Michaels, supra,* 28 Cal.4th at p. 528.)

c. Defendant then complains that the prosecutor's argument misled the jury as to the burden and standard of proof. We disagree.

The prosecutor began by explaining the purpose of closing argument: "You have actually heard all the evidence in this trial, and we're now at closing argument. And what happens at closing argument is, you will hear argument from both sides as to whether or not they feel they have proven their case. [¶] . . . [¶] What we have in argument is whether or not the points have been proven, and each side have [*sic*] proven." Defendant, who failed to object below, now argues the jury would have understood this to mean that the defense had the burden of producing evidence. Yet this ignores the fact that the prosecutor at no point ever argued that the defense had failed to prove its case, that he instead went "through each and every element of each and every allegation, just to show that we have proven our case," and that the court instructed the jury repeatedly that the People had the burden of proof. Although the question may be close, we do not believe the jury could have misunderstood its task.

The prosecutor also advised the jury that "you want to make sure that each and every allegation against the defendant has been proven to your satisfaction." The jury plainly would have understood this to mean that the crimes must be proven to its "satisfaction" *under the appropriate standard of proof,* inasmuch as the trial court had repeatedly instructed the jury as to the reasonable-doubt standard and had even explained during voir dire the prosecutor's burden to prove "to your satisfaction beyond a reasonable doubt the truth of those charges." This was not error. (See also *People v. Posey* (2004) 32 Cal.4th 193, 208, fn. 6 [8 Cal.Rptr.3d 551, 82 P.3d 755] ["the United States Constitution demands that the state prove every element of a crime beyond a reasonable doubt to the satisfaction of the jury"]; accord, *Turner v. United States* (1970) 396 U.S. 398, 405 [24 L.Ed.2d 610, 90 S.Ct. 642].)

d. The prosecutor also called defendant a liar based on his admitted lies to the police and to his girlfriend and argued, in light of those lies, that defendant had lied on the stand. This was fair comment on the evidence. (*People v. Earp, supra,* 20 Cal.4th at pp. 862–863; CALJIC No. 2.21.2.) Contrary to defendant's assertions, the prosecutor never hinted that he had special information that defendant was a liar or that defense counsel was complicit in defendant's lies.

### 8. *Cumulative Error*

Although our review has uncovered prosecutorial misconduct during the cross-examination of defendant and closing argument as well as *Doyle* error, the errors are relatively few and, as discussed above, the prejudicial effect was in each instance minimal to nonexistent. As the Attorney General points out, defendant's own statements narrowed the field of possible suspects to two people: defendant and Hicks. Defendant's claim of limited involvement was contradicted by Cunningham and Santiago, neither of whom had any reason to enhance defendant's role over that of Hicks. Defendant's height, weight, build, hairstyle, and handedness was quite distinct from Hicks's— and, for each characteristic, Johansen's eyewitness description of the shooter was consistent with defendant and inconsistent with Hicks. Defendant's claim that he had been forced at gunpoint to cooperate with Hicks was additionally undermined by the fact that Hicks let defendant, who was apparently the only surviving witness to the murders, live. Finally, defendant gave numerous conflicting, untrue statements to the police and made a confession to Eula Roberson.

The errors discussed above did not undermine the facts supporting defendant's guilt, nor has defendant explained how or why these errors in combination warrant a new trial. We therefore reject defendant's claim of prejudicial misconduct. Because we find that defendant was not prejudiced, it follows that defense counsel was not constitutionally deficient in failing to object to the asserted instances of misconduct.

### B. *The Prior-murder-conviction Special Circumstance*

Defendant was charged with a prior-murder-conviction special circumstance arising from his June 1992 conviction for the murder of Dwayne Reed. Prior to opening statements, defendant admitted the special circumstance and the trial court informed the jury of the stipulation to its truth. The jurors later returned a guilty verdict and a found true all of the special circumstance allegations.

On appeal, defendant contends that the trial court erred in failing to obtain a *personal* waiver of his right under section 190.1, subdivision (b) to have the truth of the prior-murder-conviction special circumstance determined in a separate proceeding following the guilt phase; that the trial court erred in failing to instruct the jury sua sponte on the limited purpose of the prior murder conviction; that defense counsel was constitutionally ineffective in allowing the jury to learn of the prior murder conviction during the guilt phase; and that the use of a murder that postdated the current crime to establish the prior-murder-conviction special circumstance violated the due

process and ex post facto clauses and the Fifth, Sixth, Eighth and Fourteenth Amendments of the federal Constitution.

### 1. *Lack of Personal Waiver*

Section 190.1, subdivision (b) provides that when a death penalty prosecution includes a prior-murder-conviction special-circumstance allegation, the truth of that allegation shall be determined in a separate proceeding following a finding of first degree murder by the trier of fact. Thus, a defendant may not be *forced* to undergo a unitary trial of the separate issues of the defendant's guilt of first degree murder and the truth of a prior-murder-conviction special circumstance, since such evidence may have an inflammatory effect on jurors who are asked to determine a defendant's guilt or innocence on a current charge of murder. Yet, as we held in *People v. Farnam* (2002) 28 Cal.4th 107 [121 Cal.Rptr.2d 106, 47 P.3d 988] (*Farnam*), defendants may waive this statutory right "if they believe it is in their best interests to do so." (*Id.* at p. 146.) *Farnam* relied on the broad principle that "[a] defendant may waive a right that exists for his or her own benefit, where such waiver is not against public policy." (*Ibid.*)

Defendant asks us to decide, though, not *whether* the statutory right may be waived, but *who* may waive it. In *Farnam*, the defendant filed a written motion to waive the separate proceeding, including his own declaration and that of his attorney, and reiterated the waiver on the record in open court and under the examination of the prosecutor. (*Farnam, supra,* 28 Cal.4th at pp. 145–148.) We thus considered there only the validity of a personal waiver. (*Id.* at pp. 147–148.) Here, by contrast, defendant stipulated to the truth of the prior-murder-conviction special circumstance in open court and stated that he had discussed the effect and consequence of the stipulation with counsel but did not *personally* waive the statutory right to a separate proceeding. Defendant was, however, present when the trial court announced its intention to advise the jury of the stipulation and then did so. Although defendant failed to object at either point, he now contends that, under *Farnam*, trial counsel was without power to waive his statutory right to a separate proceeding on his behalf.

Defendant misreads *Farnam*. We upheld the waiver presented in that case but nowhere suggested that a waiver could be effected *only* under identical circumstances or, in particular, that counsel could not waive the right to a separate proceeding on a defendant's behalf. Nor will we announce such a rule here. "Counsel may waive all but a few fundamental rights for a defendant." (*People v. Riel* (2000) 22 Cal.4th 1153, 1196 [96 Cal.Rptr.2d 1, 998 P.2d 969].) The reason is that when, as here, the accused exercises his or

her constitutional right to representation by professional counsel, " 'it is counsel, not defendant, who is in charge of the case. By choosing professional representation, the accused surrenders all but a handful of "fundamental" personal rights to *counsel's* complete control of defense strategies and tactics.' " (*In re Horton* (1991) 54 Cal.3d 82, 95 [284 Cal.Rptr. 305, 813 P.2d 1335].) Included in that narrow exception are such fundamental matters as whether to plead guilty, whether to waive the constitutional right to trial by jury, whether to waive the right to counsel, and whether to waive the privilege against self-incrimination. (*Ibid.*, citing cases.) "As to these rights, the criminal defendant must be admonished and the court must secure an express waiver; as to other fundamental rights of a less personal nature, courts may assume that counsel's waiver reflects the defendant's consent in the absence of an express conflict." (*Ibid.*)

Defendant insists that the statutory right to a separate proceeding on the prior-murder-conviction special-circumstance allegation falls within this narrow category of fundamental rights that cannot be waived by counsel, but his argument lacks legal support. Unlike the fundamental matters listed above, the right to a separate proceeding is merely statutory, not constitutional. Even assuming that this right is fundamental, we see no reason to treat it differently than the decision whether to testify or whether to present a defense at the guilt phase of a capital trial, either of which may be waived by counsel alone, unless the court is aware of an express conflict between counsel and the defendant. (*In re Horton, supra,* 54 Cal.3d at p. 95.) Indeed, defendant has not shown that this tactical decision differs materially from the decision during voir dire to test prospective jurors' views of the defendant's prior felony convictions, which we have likewise deemed a decision counsel is entitled to make without the defendant's permission. (*People v. Freeman, supra,* 8 Cal.4th at p. 485.) In our view, the weighing of the possible prejudice of presenting the prior murder conviction at the guilt phase against the possible prejudice of the jury's hearing of it for the first time thereafter (*Farnam, supra,* 28 Cal.4th at p. 150) is a quintessential question of evidentiary strategy and thus, at least in the absence of an express conflict that comes to the attention of the trial judge, certainly within the attorney's "general authority to control the procedural aspects of the litigation and, indeed, to bind the client in these matters." (*In re Horton, supra,* 54 Cal.3d at p. 94.)[11] The trial court thus did

---

[11] At the hearing on his new trial motion, defendant testified that he had been unaware of his statutory right to a separate proceeding and that he would not have agreed to the stipulation had he been informed of his right to bifurcate the prior-murder-conviction special circumstance. The trial court, however, rejected his testimony. Moreover, defendant nowhere contends that the trial court was or should have been aware of any conflict that may have existed between him and his attorneys on this point.

not err in failing to secure an express personal waiver of the separate proceeding from defendant.[12]

## 2. *Failure to Give Limiting Instructions Sua Sponte*

Defendant contends the trial court violated his Fifth, Eighth, and Fourteenth Amendment rights by failing to instruct the jury that the prior murder conviction could not be considered as proof that defendant was a person of bad character or had a disposition to commit crimes. Defendant had originally requested a limiting instruction patterned after CALJIC No. 2.50 (Evidence of Other Crimes) but later withdrew that request. The question here, therefore, is whether the trial court had a sua sponte duty to instruct the jury on the limited purpose of the prior murder conviction.

"We have long since held that 'in general, the trial court is under no duty to instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct.' " (*People v. Padilla* (1995) 11 Cal.4th 891, 950 [47 Cal.Rptr.2d 426, 906 P.2d 388].) Defendant relies on what we have sometimes referred to as the "possibility . . . that there might be 'an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and *minimally relevant to any legitimate purpose*,' " and urges that

---

[12] Defendant also argues that, regardless of the validity of the waiver of his statutory right to a separate proceeding on the prior-murder-conviction special circumstance, his admission of the truth of the prior-murder-conviction special circumstance was not voluntary and intelligent. We disagree. As we explained in *People v. Howard* (1992) 1 Cal.4th 1132 [5 Cal.Rptr.2d 268, 824 P.2d 1315] in discussing the failure to provide specific admonitions of the rights surrendered by the admission of a prior-prison-term allegation, the validity of the admission depends not on express admonitions and waivers but on whether the admission was "voluntary and intelligent under the totality of the circumstances." (*Id.* at p. 1178.) Although the trial court here did not enumerate the constitutional rights surrendered by defendant's plea, we cannot agree that this case presents a "[t]ruly . . . silent record" (see *People v. Mosby* (2004) 33 Cal.4th 353, 361 [15 Cal.Rptr.3d 262, 92 P.3d 841]), inasmuch as defendant stated that he had discussed the matter with his attorney and understood "the effect and consequence of admitting that prior conviction." (See *In re Patricia T.* (2001) 91 Cal.App.4th 400, 405 [109 Cal.Rptr.2d 904].) Moreover, defendant was indisputably aware of his right to a jury trial, right to confront witnesses, and privilege against self-incrimination with respect to the three other special-circumstance allegations in the information, and was in fact about to exercise those rights. He was therefore aware that those rights attached to the prior-murder-conviction special-circumstance allegation. (Cf. *Mosby, supra*, 33 Cal.4th 353, 362 ["In all of the cases just discussed a jury trial on a substantive offense *preceded* the defendants' admissions of prior convictions" (italics added)].) Finally, defendant was present in court when the trial court explained to the jury venire that if defendant were found guilty of first degree murder, the jury "will then be asked to find whether or not any of the special circumstances which are charged in this case are true." We therefore find, under the totality of the circumstances, that defendant's admission of the prior-murder-conviction special circumstance was voluntary and intelligent. (See *Mosby, supra*, 33 Cal.4th at p. 365.)

this is such an exceptional case. (*Ibid.*) We disagree. Defendant's guilt was amply supported by the eyewitness testimony of Cunningham, Santiago, and Johansen; the testimony of Eula Roberson; and defendant's own untruthful statements to police. Defendant's prior murder conviction was hardly a dominant part of the evidence in this case and, far from being minimally relevant to any legitimate purpose, was admissible for impeachment and essential to proving the prior-murder-conviction special circumstance. Moreover, the jury *was* instructed in accordance with CALJIC No. 2.23 (Believability of a Witness—Conviction of a Felony) that "[t]he fact that a witness has been convicted of a felony . . . may be considered by you *only* for the purpose of determining the believability of that witness." (Italics added; see also *Farnam, supra,* 28 Cal.4th at p. 151, fn. 22.) Unlike defendant, we do not find it reasonably likely the jury would have failed to view first degree murder as a felony. We therefore find that the trial court had no sua sponte duty to further instruct the jury on the limited purpose of defendant's prior murder conviction.

### 3. *Alleged Ineffective Assistance of Counsel*

Defendant argues that his trial attorneys were constitutionally ineffective in three respects: in allowing the jurors to learn of his prior murder conviction during the guilt phase; in failing to request a limiting instruction once the jury learned of the prior conviction; and in failing to inform him of his right to a separate proceeding on the prior-murder-conviction special circumstance under section 190.1, subdivision (b).

■ To demonstrate ineffective assistance of counsel, a defendant must show that counsel's action was, objectively considered, both deficient under prevailing professional norms and prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 104 S.Ct. 2052].) To establish prejudice, a defendant must show a reasonable probability that, but for counsel's failings, the result of the proceeding would have been more favorable to the defendant. (*Id.* at p. 694.) " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' [Citation.] '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation]. 'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 925–926 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

Defense counsel testified at the hearing on the new trial motion that their decision to waive the separate statutory proceeding was part of a reasoned, deliberate strategy (1) to weed out prospective jurors who would automatically vote for death based on defendant's prior murder conviction, (2) to be candid and forthright with the jury about the crimes (including the Reed murder) defendant *did* commit, and (3) to minimize thereby the weight the jury would accord the prior conviction as impeachment during the guilt phase and as an aggravating factor during the penalty phase. Reviewing this strategy with appropriate deference, we find no error.

The strategy assumed that defendant would testify, which he did. This assumption was reasonable, inasmuch as any hope that defendant would be acquitted of the murders rested on his credibility. His statements to police, while contradictory, established that he had been present when the shooting began in the motel room and in the car pursuing Stevenson before he was shot. Although defendant denied to police that he was the shooter, counsel reasonably concluded that the jury needed to hear this exculpatory account from defendant himself, that his testimony was "absolutely essential" to establishing his role, and that there was no realistic way around it.

If defendant testified, however, he was quite likely to be impeached with his prior convictions, including his prior murder conviction. Such impeachment would have nullified any benefit from a separate proceeding on the prior-murder-conviction special circumstance. Although defendant now argues that the trial court could have sanitized the priors, defense counsel were justifiably concerned that, even if that were done, the jury would nonetheless speculate as to the nature of the impeaching priors and conclude they were for similar or other heinous offenses. (See *People v. Massey* (1987) 192 Cal.App.3d 819, 825 [237 Cal.Rptr. 734].) The defense was likewise concerned that the People might acquire stronger evidence to support their claim that the same firearm had been used in these crimes and in the Dwayne Reed murder and renew, as they eventually did, their pretrial motion to offer evidence of the circumstances of that murder. Had that motion succeeded, the benefit of the separate proceeding would once again have disappeared. Based on the attorneys' reasonable belief that the jury would thus become aware (or at least suspect) that defendant had a prior murder conviction, defense counsel chose to make the best of a bad situation by volunteering the fact of the prior murder conviction and thus appearing to be completely candid and forthright in their defense. This strategy was rational. (See *People v. Wright* (1990) 52 Cal.3d 367, 415 [276 Cal.Rptr. 731, 802 P.2d 221].)

Additionally, defense counsel were concerned that if the jury were to discover the prior murder conviction only in a bifurcated proceeding, "it

would be like hitting the jury in the face with a dead fish" as the case proceeded to the penalty phase. Although counsel believed the guilt phase was "defensible," they also believed it "was going to be very difficult" and that a penalty phase was therefore a real possibility. The defense strategy, which sought to neutralize the prior murder conviction by bringing it up on counsel's terms and at a time of their choosing, at a minimum enabled the defense to eliminate those prospective jurors who were likely to vote for death simply because of the Reed murder[13] and perhaps to mitigate its sting by the time the case proceeded to the penalty phase. This strategy, too, was within constitutional limits. (*Farnam, supra*, 28 Cal.4th at p. 150; *People v. Freeman, supra*, 8 Cal.4th at p. 484.)

Defendant also complains that counsel's failure to request a limiting instruction concerning his prior murder conviction demonstrated ineffective assistance, but counsel may have deemed it unwise to call further attention to it. (*People v. Freeman, supra*, 8 Cal.4th at p. 495; *People v. Johnson* (1993) 6 Cal.4th 1, 50 [23 Cal.Rptr.2d 593, 859 P.2d 673].) Moreover, as discussed in the preceding section, the instructions given were adequate to guide the jury's use of the prior conviction.

Finally, defendant claims that counsel were incompetent in failing to advise him of his right to a separate proceeding for the prior-murder-conviction special circumstance. Assuming arguendo that defendant's consent was necessary to waive the separate statutory proceeding, the appellate record does not establish that he did not in fact consent. Although defendant testified at the new trial motion that he had never been advised of his right to a separate proceeding or the reason for waiving one, he did not identify this as a basis for relief in his new trial motion and, consequently, his trial attorneys were never asked whether defendant had been advised of this right and the consequences of waiving it. Inasmuch as the trial court found defendant's testimony not credible in general, the appellate record does not support the factual predicate for this claim, and we therefore reject it. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241 [69 Cal.Rptr.2d 784, 947 P.2d 1321]; see *People v. Michaels, supra*, 28 Cal.4th at p. 526, fn. 6.)

---

[13] Defendant asserts that counsel could have used open-ended questions to discover whether prospective jurors would automatically vote for the death penalty when there was a prior murder conviction. Although we agree that such questions are permissible (e.g., *People v. Cash* (2002) 28 Cal.4th 703, 719 [122 Cal.Rptr.2d 545, 50 P.3d 332]), counsel could reasonably have preferred a more direct approach that guaranteed an accurate assessment of the jurors' views. The question here is not whether counsel might have followed a different path, but whether the path that *was* followed was an informed tactical choice within the range of professional competence. (*Strickland v. Washington, supra*, 466 U.S. at p. 689.)

### 4. *The Special Circumstance's Reliance on Murder That Postdated Current Crime*

██ Defendant contends the prior-murder-conviction special circumstance must be reversed because the underlying murder occurred after the three murders at issue in this proceeding and thus does not qualify as a "prior" murder. As we explained in *People v. Gurule* (2002) 28 Cal.4th 557, 635 [123 Cal.Rptr.2d 345, 51 P.3d 224], "that fact does not undermine the correctness of the special circumstance finding because, for purposes of the prior-murder special circumstance, '[t]he order of the commission of the homicides is immaterial.' " Inasmuch as the prior-murder-conviction special circumstance was in effect at the time the current crimes were committed and had already been interpreted to encompass *all* murders committed by a defendant (see *People v. Hendricks* (1987) 43 Cal.3d 584, 595 [238 Cal.Rptr. 66, 737 P.2d 1350]), there can be no violation of the due process or ex post facto clauses. (*Gurule, supra,* 28 Cal.4th at p. 637.) Nothing in *Sattazahn v. Pennsylvania* (2003) 537 U.S. 101 [154 L.Ed.2d 588, 123 S.Ct. 732], which addressed whether a penalty retrial violated the double jeopardy clause, calls into question our earlier analysis of those claims.

### C. *Alleged Instructional Error*

Defendant claims a number of instructional errors deprived him of his rights to due process, to a jury trial, to present a defense, to a reliable verdict, and to state-created safeguards, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 1. *Accomplice Instructions*

Defendant requested that, with respect to the testimony of Cunningham and Santiago, the jury be instructed that accomplice testimony must be corroborated and should be viewed with distrust. The trial court refused the request.

██ An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant." (§ 1111.) A witness is liable to prosecution within the meaning of section 1111 if he or she is a principal in the crime. (*People v. Lewis* (2001) 26 Cal.4th 334, 368–369 & fn. 31 [110 Cal.Rptr.2d 272, 28 P.3d 34].) If there is evidence to permit a jury to find by a preponderance of the evidence the witness was an accomplice, " 'the trial court must instruct the jury that the witness's testimony should be viewed with distrust.' " (*People v. Hernandez* (2003) 30 Cal.4th 835, 874 [134 Cal.Rptr.2d 602, 69 P.3d 446].) " 'But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony.' " (*People v. Lewis, supra,* 26 Cal.4th at p. 369.)

We find no error as to Santiago, who merely delivered the money to Stevenson. Although Santiago certainly participated in the drug deal, there is nothing to indicate that she was liable to prosecution for the sale of a nonnarcotic in lieu of a narcotic under Health and Safety Code section 11355. (See *People v. Edwards* (1985) 39 Cal.3d 107, 114, fn. 5 [216 Cal.Rptr. 397, 702 P.2d 555].) Indeed, defendant does not claim that Santiago could have been prosecuted under that provision but argues instead that she, along with Cunningham, must have conspired to steal Stevenson's money and that both were thereby liable to prosecution for attempted robbery or even murder. The record, however, offers no evidence that either Santiago or Cunningham stole the money or, even if they did, that they formed the intent to do so prior to the murders. Nor do we accept defendant's suggestion that murder was a natural and probable consequence of any drug deal "involving a large sum of money." (Cf. *People v. Garceau* (1993) 6 Cal.4th 140, 183–184 [24 Cal.Rptr.2d 664, 862 P.2d 664].)

Cunningham, on the other hand, did introduce Stevenson to Barnes and Brown and was to receive a commission for his role in locating the drug suppliers. Yet, even assuming that the trial court erred in failing to instruct as to the possibility that Cunningham was an accomplice in the sale of a nonnarcotic in lieu of a narcotic, the error was harmless. "A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record. [Citation.] 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]' . . . The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' " (*People v. Lewis, supra,* 26 Cal.4th at p. 370.)

Cunningham's testimony was sufficiently corroborated. Defendant himself testified that he brought the drugs into the motel room, was present when the shooting began, and pursued Stevenson in the car. Johansen testified that the shooter resembled defendant and did not resemble Hicks. Forensic evidence indicated that more than one weapon was used in the motel room. Santiago testified that defendant accompanied Stevenson to her car and asked to see the money. Finally, defendant admitted his culpability for the murders to Eula Roberson.

Moreover, the jury was instructed in accordance with a modified version of CALJIC No. 2.20 that in assessing the credibility of a witness it may consider "[t]he existence . . . of a bias, interest or other motive"; "[a] statement previously made by the witness that is . . . inconsistent with the testimony of the witness"; "[a]n admission by the witness of untruthfulness"; "[t]he witness' prior conviction of a felony"; and "the fact that the witness testified

under a grant of immunity." Inasmuch as the most often cited rationale for the instruction to view accomplice testimony with caution is "because he or she 'usually testif[ies] in the hope of favor or the expectation of immunity' " (*People v. Tobias* (2001) 25 Cal.4th 327, 331 [106 Cal.Rptr.2d 80, 21 P.3d 758]) and the jury knew that Cunningham had *already* been granted immunity, there was no reasonable probability defendant would have obtained a more favorable result had the trial court instructed the jury with the full complement of accomplice instructions. (*People v. Lewis, supra,* 26 Cal.4th at p. 371; see also *People v. Box* (2000) 23 Cal.4th 1153, 1208–1209 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

In addition, defendant nowhere contended that Cunningham helped him commit the crimes, nor was there evidence they were working together. "Thus, the instructions requested would have informed the jury to view [Cunningham's] testimony with distrust if the jury determined that [Cunningham]—and not defendant—committed the crimes. Any reasonable juror would reach this conclusion without instruction." (*People v. Lewis, supra,* 26 Cal.4th at p. 371.) We thus reject defendant's state and federal claims of reversible error. (*Ibid.*)

Finally, we reject defendant's claim that the absence of appropriate instructions concerning accomplice testimony would have led the jury, erroneously, to interpret CALJIC No. 2.11.5 to bar consideration of the fact that Cunningham (or Santiago, for that matter) had testified under a grant of immunity. CALJIC No. 2.11.5 provides: "There has been evidence in this case indicating that a person other than the defendant was or may have been involved in the crime for which the defendant is on trial. There may be many reasons why such person is not on trial. [¶] Therefore, do not discuss or give any consideration as to why the other person is not being prosecuted in this trial, or whether he has been or will be prosecuted. Your duty is to decide whether the People have proved the guilt of the defendant on trial." Because the instruction applied to Hicks, it was properly given in this case. Moreover, the jury was also instructed that it may consider "the fact that the witness testified under a grant of immunity" in assessing that witness's credibility. We thus perceive no reasonable likelihood the jury would have misconstrued the instruction in the manner defendant imagines. (*People v. Crew* (2003) 31 Cal.4th 822, 845 [3 Cal.Rptr.3d 733, 74 P.3d 820].)

### 2. *Felony-murder Instructions*

Defendant next contends that the trial court erred in failing to instruct the jury sua sponte that he could not be guilty of felony murder if he became an aider and abettor to a robbery only after the motel victims had been fatally wounded. He hypothesizes that the jury could have found that defendant,

with no preexisting knowledge that Hicks intended a robbery and murder, decided to assist Hicks after the motel murders by acting only as a getaway driver, thereby facilitating the flight from the burglary and robbery. He relies on *People v. Pulido* (1997) 15 Cal.4th 713, 723 [63 Cal.Rptr.2d 625, 936 P.2d 1235] (*Pulido*), in which we said that "[o]ur cases establishing the complicity of a nonkiller in a felony murder have thus uniformly required, at a minimum, that the accomplice have been, at the time of the killing, a conspirator or aider and abetter in the felony." His reliance is misplaced.

As in *Pulido*, we need not decide whether the trial court had any sua sponte duty to instruct on the nonliability of late joiners, "because defendant cannot demonstrate prejudice from the asserted instructional error." (*Pulido, supra,* 15 Cal.4th at p. 726.) The jury found true that defendant *personally* used a firearm in the commission of the attempted robbery at the motel, which meant that he could not have formed the intent to rob only *after* the murders. Defendant speculates that the jury might nonetheless have found that he used or menacingly displayed a firearm during the flight *following* the robbery (see CALJIC No. 9.44), but the record contains no evidence at all that the driver of the vehicle ever used or menacingly displayed a weapon. The jury thus would not have relied on such a theory. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].) In any event, the jury also found that defendant was personally armed with a firearm in the commission of the drug transaction, which again preceded the flight from the motel room. Finally, the jury found true the burglary-murder special circumstance, which necessarily included a finding that defendant committed a burglary—i.e., that he formed the intent to rob *before he entered the motel room*. In sum, defendant could not have been prejudiced. (See *Hines, supra,* 15 Cal.4th at pp. 1049–1050.)

### 3. *Duress Instructions*

The trial court instructed the jury in accordance with CALJIC No. 4.40 that a person is not guilty of a crime when he engages in conduct, otherwise criminal, under the reasonable belief that his life would be in immediate danger if he did not engage in the charged conduct. The trial court also used CALJIC No. 4.41, which stated: "When a person commits a crime punishable with death, it is not a defense that he committed the act or made the omission under threats or menaces of immediate death or bodily harm." Defendant contends that these instructions "prohibited the jury from considering that [his] honest belief that Hicks was threatening his life could negate the specific intent requirements and mental state elements of first-degree murder." No error appears.

"[D]uress is not a defense to *any* murder" (*People v. Maury* (2003) 30 Cal.4th 342, 421 [133 Cal.Rptr.2d 561, 68 P.3d 1]) and, in particular, does not

negate malice. (*People v. Anderson* (2002) 28 Cal.4th 767, 783–784 [122 Cal.Rptr.2d 587, 50 P.3d 368].) Duress likewise does not categorically negate premeditation and deliberation, although "[i]f a person obeys an order to kill without reflection, the jury might find no premeditation and thus convict of second degree murder." (*Id.* at p. 784.) Finally, "duress can, in effect, provide a defense to murder on a felony-murder theory by negating the underlying felony." (*Ibid.*)

The instructions thus correctly informed the jury that threats and menace do not constitute a *defense* to murder. Nothing in these instructions barred the jury from considering whether these threats—or any other facts—prevented defendant from premeditating and deliberating or rendered noncriminal his participation in the attempted robbery. Indeed, the jury's finding that defendant was guilty of attempted robbery reveals that the jury disbelieved defendant's claim of duress. (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 100, fn. 31.) Finally, there is nothing in the record to suggest that defendant participated voluntarily in the motel room robbery-murders but pursued Stevenson, who was then presumed to be the only surviving witness to the motel murders, only under duress. Defendant's implied suggestion that the jury might have rejected duress as to the motel crimes but have accepted it as to Stevenson's murder thus fails.

### 4. *Second Degree Murder Instructions*

The jury was instructed with CALJIC No. 8.30 (Unpremeditated Murder of the Second Degree) as well as No. 8.75 (Jury May Return Partial Verdict—Homicide). Defendant contends the trial court prejudicially erred by failing additionally to instruct sua sponte with CALJIC Nos. 8.70 (Duty of Jury as to Degree of Murder), 8.71 (Doubt Whether First or Second Degree Murder), and 8.74 (Unanimous Agreement as to Offenses—First or Second Degree Murder). Without these instructions, defendant argues, the jury would not have understood "how doubts about the proper offense—first degree murder or second degree murder—should be resolved." We disagree. In addition to CALJIC No. 8.75, which directed the jury to consider second degree murder if it was unable to find defendant guilty unanimously and beyond a reasonable doubt of first degree murder, the jury was instructed that a guilty verdict required unanimous agreement that defendant's guilt of the crime had been established beyond a reasonable doubt. Considering these instructions as a whole (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 [74 Cal.Rptr.2d 212, 954 P.2d 475]), the jury was adequately instructed as to the significance of a reasonable doubt as to defendant's guilt of first degree murder and the availability of second degree murder as a lesser offense.

Inasmuch as defendant's sole basis for reducing the murders to second degree was his claim of duress, which the jury necessarily rejected in

convicting him of attempted robbery, defendant also could not have been prejudiced by any error. (See *People v. Morris* (1991) 53 Cal.3d 152, 211 [279 Cal.Rptr. 720, 807 P.2d 949]; *People v. Kozel* (1982) 133 Cal.App.3d 507, 528–529 [184 Cal.Rptr. 208].)

### D. *Sufficiency of Evidence of Robbery and Burglary*

Defendant contends the evidence was insufficient to sustain the murders to the extent they relied on a robbery-murder theory or to sustain the robbery-murder special circumstance or the attempted robbery. In the main, defendant's arguments rest on the assumption that no money was brought into the motel room. Without the money, defendant reasons, no taking or attempted taking could have been effected from the immediate presence of Brown or Stevenson (see *People v. Nguyen* (2000) 24 Cal.4th 756, 764–765 [102 Cal.Rptr.2d 548, 14 P.3d 221]); without the money, defendant also argues, he could not have formed the intent to steal at the requisite point (i.e., before or during the commission of the act of force). (*People v. Marshall* (1997) 15 Cal.4th 1, 34 [61 Cal.Rptr.2d 84, 931 P.2d 262].) He thereby claims a violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution as well as sections 7, 15, and 17 of article I and section 15 of article II of the California Constitution.

In reviewing a criminal conviction challenged as lacking evidentiary support, " 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Hillhouse, supra,* 27 Cal.4th at p. 496.) The same standard of review applies to special circumstance allegations. (*People v. Maury, supra,* 30 Cal.4th at p. 396.)

There was sufficient evidence here to support a finding of robbery or attempted robbery. Before he brought the packages into the motel room, defendant knew that they contained flour and that Hicks was "fixing to jack" the buyers. Defendant also demanded to see the money before he brought the packages into the motel room. When Santiago drove up, Stevenson showed defendant the money in the tennis bag. Stevenson tossed one bundle of cash into Santiago's car and took the bag. The men then walked toward the motel. Police found no tennis bag or bundles of money in the motel room.

Defendant challenges Santiago's testimony on a number of grounds, but none of them is persuasive. He points out first that Santiago did not see Stevenson actually enter the room with money, but it strains credulity to suggest that Stevenson would have left a bag containing in excess of $50,000

unattended *outside* the motel room. Indeed, Santiago testified that Stevenson took the money into the motel room "[t]o the best of [her] knowledge." Defendant then cites the testimony of Cunningham, who did not see Stevenson carry anything into the motel room, and his own testimony that the bag stayed in Santiago's car. Conflicting evidence, however, does not establish that the evidence on one side or the other was insufficient. (*People v. Panah* (2005) 35 Cal.4th 395, 489 [25 Cal.Rptr.3d 672, 107 P.3d 790].) Moreover, as the trial court noted in denying defendant's motion for acquittal, the bag was collapsible and "basically empty" and could have been stuffed inside Stevenson's long, thick coat.

Defendant asserts next that Stevenson "likely" would have left the cash with Santiago after demonstrating to defendant that he had the cash. Although it would certainly be logical to avoid bringing a large amount of cash into the motel room before the narcotics had been tested, it is not the only possible way to structure a transaction. Indeed, Santiago testified that, as Stevenson's runner, she routinely delivered the cash and then returned to pick up the drugs. Her testimony that Stevenson carried the cash into the motel room is neither so inherently incredible nor physically impossible as to be unworthy of belief. (*People v. Panah, supra,* 35 Cal.4th at p. 489.)[14]

 Defendant also claims the trial court erred in failing to instruct on the lesser included offense of theft. He reasons that the jury could have found that Hicks alone intended to steal before the shootings occurred, that Hicks got into the BMW with the money, and that defendant merely assisted Hicks in his escape and thus formed the intent to steal only *after* force was used. Defendant assumes, without citation, that under this scenario he would be guilty only of theft, not robbery. He is mistaken. In *People v. Cooper* (1991) 53 Cal.3d 1158, 1161 [282 Cal.Rptr. 450, 811 P.2d 742], we held that "a getaway driver who has no prior knowledge of a robbery, but who forms the intent to aid in carrying away the loot during such asportation, may properly be found liable as an aider and abettor of the robbery." Even if the trial court had erred in failing to instruct on theft, however, the error would be harmless, inasmuch as the jury necessarily rejected defendant's claim that he was unaware of Hicks's intent prior to the shootings by finding the burglary-murder special circumstance true. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085–1086 [119 Cal.Rptr.2d 859, 46 P.3d 335].)

 Finally, defendant argues that the evidence of burglary was insufficient because Barnes, sharing defendant's felonious intent, had invited defendant into the motel room. He relies on *People v. Salemme* (1992) 2

---

[14] Defendant also argues that even if Stevenson brought the money into the motel room, there is no evidence that any property was taken from Brown. Not so. Brown was Stevenson's partner in the drug deal and thus had constructive possession of the purchase money. (*People v. Miles* (1982) 43 Cal.App.4th 364, 369, fn. 5 [51 Cal.Rptr.2d 87].)

Cal.App.4th 775, 781 [3 Cal.Rptr.2d 398], in which the Court of Appeal said that a person who enters a structure with the intent to commit a felony is guilty of burglary "*except* when he or she (1) has an unconditional possessory right to enter as the occupant of that structure or (2) is invited in by the occupant who knows of and endorses the felonious intent." Although Barnes unquestionably knew of and participated in the drug transaction, the felonious intent underlying burglary-murder and the burglary-murder special circumstance in this case was the intent to rob, and the record contains no evidence that Barnes knew of and endorsed *that* felonious intent. In particular, there was no evidence that Barnes was aware the packages contained flour, inasmuch as he was in the process of testing the drugs at the time the shooting began. There was also no evidence that he intended to rob Stevenson and Brown. Indeed, Barnes was shot twice and killed in the course of the burglary-robbery.[15] Because there was no evidence that Barnes knew of or endorsed defendant's intent, there was ample evidence to support the burglary-murder special circumstance. (*People v. Frye* (1998) 18 Cal.4th 894, 954 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Matson* (1974) 13 Cal.3d 35, 41 [117 Cal.Rptr. 664, 528 P.2d 752].) For the same reason, the trial court did not err in refusing defendant's instruction describing this exception to burglary. (*People v. Salemme, supra,* 2 Cal.App.4th 775, 781; see generally *People v. Memro* (1995) 11 Cal.4th 786, 868 [47 Cal.Rptr.2d 219, 905 P.2d 1305] ["A party is not entitled to an instruction on a theory for which there is no supporting evidence"].)[16]

## E. *Alleged Evidentiary Error*

Defendant asserts the trial court violated state law and deprived him of due process, a reliable guilt phase determination, and his right to confront witnesses under the state and federal Constitutions by erroneously admitting certain evidence. He also asserts that the trial court violated state law and deprived him of due process, a reliable guilt phase determination, and his right to present a defense under the state and federal Constitutions by erroneously excluding certain other evidence.

### 1. *Admission of Defendant's Prior Felony Convictions for Impeachment*

Defendant challenges the use of his 1992 convictions for murder, attempted murder, and assault with a firearm as impeachment on a variety of grounds:

---

[15] Although defendant asserts Barnes "was likely shot by accident," there is no evidence that any accident occurred in firing on the unarmed men in the motel room. Indeed, Barnes was shot more than once.

[16] For the same reasons, we find that counsel was not deficient in failing to file a motion to dismiss the burglary-murder special circumstance prior to trial.

(a) that they were inadmissible as a matter of law in that they related to an incident that postdated the current murders; (b) that these violent offenses did not bear on his veracity and were too similar to the charged crimes; (c) that the prior murder conviction had already been admitted by stipulation and therefore did not need to be "emphasize[d]" to the jury by the prosecutor in cross-examination; (d) that the jury would have been under the misimpression that these prior convictions arose from three separate incidents; and (e) that the attempted murder and assault convictions were cumulative and unnecessary impeachment, given the introduction of his prior murder conviction.

 "[T]he trial courts have broad discretion to admit or exclude prior convictions for impeachment purposes . . . . The discretion is as broad as necessary to deal with the great variety of factual situations in which the issue arises, and in most instances the appellate courts will uphold its exercise whether the conviction is admitted or excluded." (*People v. Collins* (1986) 42 Cal.3d 378, 389 [228 Cal.Rptr. 899, 722 P.2d 173].) No abuse of discretion appears.

a. Defendant argues that he may be impeached only by conduct evincing dishonesty or moral turpitude that predates the charged crime. He analogizes to *People v. Balderas* (1985) 41 Cal.3d 144, 201 [222 Cal.Rptr. 184, 711 P.2d 480], in which we said that "the 'prior felony conviction[s]' described in subdivision (c) of section 190.3 are limited to those entered *before commission* of the capital crime." But the statute governing impeachment, Evidence Code section 788, contains no such limitation. The admission of a felony conviction for impeachment tests the defendant's credibility as a witness during trial. Whether the offense predated the charged crime has no bearing on its relevance to that issue. We therefore hold that a prior felony conviction for purposes of impeachment under Evidence Code section 788 means any conviction suffered before trial, regardless of the offense date. (*People v. Halsey* (1993) 21 Cal.App.4th 325, 328 [26 Cal.Rptr.2d 701]; cf. *People v. Gurule, supra,* 28 Cal.4th at p. 635 [rejecting the defendant's attempt to impose a similar limitation on the prior-murder-conviction special circumstance].)

b. Defendant argues next that the convictions for the Reed murder, attempted murder, and assault with a firearm did not bear directly on his veracity. Relying on *People v. Gurule, supra,* 28 Cal.4th at page 608, and other cases involving crimes committed prior to the passage of Proposition 8, he contends these crimes of violence were not admissible for impeachment. But defendant fails to acknowledge section 28, subdivision (f) of article I of the California Constitution, which was added by Proposition 8 and which provides in pertinent part that "[a]ny prior felony conviction . . . shall subsequently be used without limitation for purposes of impeachment . . . in any criminal

proceeding. . . ." We held in *People v. Castro* (1985) 38 Cal.3d 301, 306 [211 Cal.Rptr. 719, 696 P.2d 111], "that—always subject to the trial court's discretion under [Evidence Code] section 352—[Proposition 8] authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty." Defendant's convictions for murder, attempted murder, and assault with a firearm denote moral turpitude and are therefore admissible for impeachment. (*Castro, supra,* 38 Cal.3d at p. 315.)

Defendant's objection that the priors ought to have been excluded as too similar to the charged crime is likewise without merit. "While before passage of Proposition 8, past offenses similar or identical to the offense on trial were excluded, now the rule of exclusion on this ground is no longer inflexible." (*People v. Tamborrino* (1989) 215 Cal.App.3d 575, 590 [263 Cal.Rptr. 731]; see generally *People v. Gutierrez, supra,* 28 Cal.4th at p. 1139, citing *Tamborrino.*) Inasmuch as defendant had no other prior felony convictions available for impeachment, the trial court did not abuse its discretion in admitting these crimes of violence. (*Tamborrino, supra,* 215 Cal.App.3d at p. 590.) To do otherwise would have given defendant a " 'false aura of veracity.' " (*Ibid.;* see also *People v. Muldrow* (1988) 202 Cal.App.3d 636, 647 [248 Cal.Rptr. 891].)[17]

c. Although defendant criticizes the trial court for allowing the prosecutor to "emphasize" the prior murder conviction in cross-examination after the defense had already stipulated to it, we see no abuse of discretion. Each side elicited the fact of the three impeaching convictions in very summary fashion. Defendant could not have been prejudiced by this procedure.

d. We reject as speculative defendant's claim that the jury would have mistakenly believed the three convictions arose from three separate incidents. The jury was told that all three convictions occurred in one "case."

e. We also reject defendant's contention that impeachment with the attempted murder and assault with a firearm were unnecessary and cumulative to the murder conviction. We have noted that a series of relevant crimes is more probative of credibility than a single lapse. (*People v. Holt* (1984) 37 Cal.3d 436, 452 [208 Cal.Rptr. 547, 690 P.2d 1207].) Similarly, defendant's firing four shots at the murder victim's fleeing companion, one of which hit a three-and-one-half-year-old girl, is more aggravated than the murder itself and thus more illuminating as to his credibility. The trial court therefore did not abuse its discretion in finding that admitting the two other convictions would not be "unduly prejudicial." (See *People v. Smithey, supra,* 20 Cal.4th at p. 970.)

---

[17] It therefore follows that defense counsel was not incompetent in failing to file a motion in limine to prohibit the use of these convictions for impeachment.

### 2. *Admission of Cunningham's Lay Opinion That Defendant Was Directing Barnes in Drug Transaction*

The prosecution elicited from Cunningham that Barnes was initially unable to answer basic questions about the transaction (such as price, quantity, and the time and place); that Barnes said he would need to contact "his people" to get that information; that the next day Barnes said he had been having trouble contacting those people; that Barnes had proposed driving around the neighborhood to find the person with the answers; that during the drive Barnes pointed at defendant, said "That's him over there," and talked to him for a few minutes; that Barnes came back to the car after the conversation with defendant and told Cunningham that "things are going to work out"; that Barnes immediately thereafter paged Stevenson and gave him the details of the transaction; that Barnes said he could not deliver the drugs himself and that his suppliers would be handling the delivery personally; and that defendant and Hicks thereafter drove up with the wrapped packages at the appointed day and time. The prosecutor then asked Cunningham, over defendant's objection, whether it appeared to him that defendant "was the person who was directing Landis Barnes in this operation." Cunningham testified that it did so appear. On appeal, defendant renews the objection. We find no prejudicial error.

A lay witness may express an opinion based on his or her perception, but only where helpful to a clear understanding of the witness's testimony (Evid. Code, § 800, subd. (b)), "i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed." (*People v. Melton* (1988) 44 Cal.3d 713, 744 [244 Cal.Rptr. 867, 750 P.2d 741].) It is certainly possible that Cunningham's impression rested on subtle or complex interactions between Barnes and defendant that were difficult to put into words, which would render Cunningham's opinion proper. (See *People v. Williams* (1988) 44 Cal.3d 883, 915 [245 Cal.Rptr. 336, 751 P.2d 395]; cf. *Melton, supra,* 44 Cal.3d at p. 744 [lay opinion of witness's veracity is improper].) But, even if it did not, defendant could not have been prejudiced, inasmuch as Cunningham was able to provide concrete and compelling evidence that defendant *was* directing Barnes in this transaction. Indeed, further evidence on this point was provided by Santiago, who testified that defendant joined Stevenson to verify the money had arrived, and by the fact that Barnes was shot in the motel room. There is no reasonable probability of a different result even if Cunningham's opinion had been omitted.

For the same reasons, defendant's claim that the prosecutor committed prejudicial misconduct in eliciting Cunningham's opinion also fails.

### 3. *Exclusion of Defendant's Willingness to Take Polygraph Test*

At trial, defendant sought to introduce evidence that he had agreed to the district attorney's request to submit to a polygraph examination. The court sustained the People's objection under Evidence Code section 351.1, subdivision (a), which makes inadmissible "any reference to an offer to take, failure to take, or taking of a polygraph examination." Defendant contends the exclusion of this evidence deprived him of due process and his right to present a defense at the guilt phase and his right to a reliable verdict and to be free from cruel and unusual punishment at the penalty phase. No error appears, because excluding this evidence did not violate defendant's constitutional rights. (*People v. Samuels* (2005) 36 Cal.4th 96, 128 [30 Cal.Rptr.3d 105, 113 P.3d 1125]; *People v. Wilkinson* (2004) 33 Cal.4th 821, 849–850 [16 Cal.Rptr.3d 420, 94 P.3d 551].) "A per se rule excluding polygraph evidence is a 'rational and proportional means of advancing the legitimate interest in barring unreliable evidence.' " (*People v. Maury, supra*, 30 Cal.4th at p. 413.)

We also observe that defendant failed to offer any evidence that polygraph examinations were reliable. (*People v. Burgener* (2003) 29 Cal.4th 833, 871 [129 Cal.Rptr.2d 747, 62 P.3d 1]; see *People v. Wilkinson, supra*, 33 Cal.4th at p. 850.)

### 4. *Admission of Eula Roberson's Testimony Concerning Confession by "E Money"*

Eula Roberson testified not only at this trial but also at an earlier trial in which defendant was convicted of murder, attempted murder, and assault with a firearm arising from the murder of Dwayne Reed. Roberson, who was Reed's aunt, told the police that defendant, also known as "E Money," had telephoned her and admitted that he had killed her nephew. She also said that defendant was the only "Eric" with whom she was acquainted. In this trial, the prosecution successfully sought to introduce evidence that, during the same conversation, defendant had also admitted killing three people in Monterey Park. Defendant argues, as he did below, that the trial court erred in admitting evidence of E Money's confession to the three murders in Monterey Park in that there was insufficient foundation that he was E Money and that the alleged confession was more prejudicial than probative.

When the relevance of proffered evidence depends upon the existence of a preliminary fact, the trial court must determine whether the evidence is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence. (Evid. Code, § 403, subd. (a); *People v. Marshall* (1996) 13 Cal.4th 799, 832 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) The record here, including the Evidence Code section 402 hearing and the

actual trial testimony, supports the trial court's finding that an adequate foundation had been established.

Detective Larry Kallestad testified that he received a call from a woman identifying herself as Eula Roberson around 9:00 p.m. on August 8, 1989. Roberson said she had some information she wanted to convey to detectives—i.e., that E Money recently told her he had killed three people in Monterey Park. When Kallestad asked Roberson whether she knew E Money by another name, she said "you know, Eric." When Kallestad said he wanted her to talk to the detectives involved in this investigation, Roberson said she wanted to be picked up in a nondescript car and interviewed somewhere other than her home. Kallestad wrote down her address and phone number and told her the detectives would contact her the next day.

Roberson's testimony at trial corroborated Kallestad's testimony in some respects and disagreed with it in others. Roberson admitted calling police to leave a message for the detectives and to ask that any police interview be conducted away from her home. She also testified that she knew defendant, who used to visit her nephews and son once or twice a week. However, she denied that defendant was E Money, even though she admitted that defendant was the only "Eric" she knew; denied that defendant had ever mentioned anything to her about the Monterey Park murders; and denied telling police that E Money had confessed to killing three people in Monterey Park.

In admitting the evidence of Roberson's statement, the trial court reasoned that a trier of fact could find that Roberson called the police on August 8, 1989, that Roberson told them of E Money's confession to the three Monterey Park murders, that E Money did in fact confess the murders to her, and that defendant—who was the only Eric she knew—was E Money. No abuse of discretion appears. Although defendant is correct that the relevance of Roberson's statements depended upon the preliminary fact that defendant was E Money and that Roberson denied at trial that he was, the record also supported a finding that Roberson's in-court testimony was unreliable and that her prior inconsistent statements were more accurate. (See Evid. Code, § 1236.) The latter evidence, combined with her admission that defendant was the only Eric she knew, was sufficient to establish the requisite preliminary fact. The existence of conflicting evidence did not inexorably prevent a finding that an adequate foundation existed.

Nor do we find error in the trial court's failure to instruct the jury to determine whether the preliminary fact had been established and to disregard the evidence unless it did so find. A trial court has no general sua sponte duty to instruct on this point, and the trial court did not abuse its discretion in failing to do so in this case. (*People v. Marshall, supra,* 13 Cal.4th at p. 833;

Evid. Code, § 403, subd. (c)(1).) In any event, the jurors were instructed that they "are the exclusive judges as to whether the defendant made an admission"; that if they find defendant did not make the statement, they "must reject it"; and that "[e]vidence of an oral admission . . . should be viewed with caution." Moreover, defense counsel expressed doubt in argument that defendant had told Roberson any such thing or that Roberson had made such a statement to police, and urged the jury to reject the evidence. We therefore see no possibility the jury could have misunderstood its obligation to determine whether defendant was E Money before considering the significance of Roberson's statements. (*People v. Marshall, supra,* 13 Cal.4th at pp. 833–834.)

■ Finally, we reject defendant's substantive and procedural claim of error under Evidence Code section 352. "[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1169 [113 Cal.Rptr.2d 827, 34 P.3d 937].) Here, the court held a hearing outside the jury's presence, at which defense counsel objected on both foundational and section 352 grounds, and found that the foundational requirements had been met, that the evidence had "some probative value," and that it was "an appropriate area to cover." Furthermore, the court ensured that the testimony was tailored so as to avoid any prejudicial references to defendant's involvement in the murder of Roberson's nephew, and personally instructed the witness not to make any mention of her nephew's murder. The record as a whole thus shows the trial court undertook a weighing of the probative value and the prejudicial effect of the evidence in making its ruling. (*Taylor, supra,* 26 Cal.4th at p. 1169.) Also, having limited the testimony in this fashion, the trial court did not abuse its discretion in overruling the section 352 objection.

### 5. Admission of Defendant's Statements to Tarsha Smith

During a police interview following his arrest on June 8, 1988, defendant said that Barnes had offered him $3,000 to provide "protection" during a drug deal. Defendant told police he did not have a gun and therefore refused to participate. Defendant also said he learned only later, by watching the news, that Barnes had been killed. Prior to the next round of interviews, in which defendant admitted being present (albeit as a surprised bystander and a reluctant getaway driver) during the murders, defendant's girlfriend, Tarsha Smith, visited defendant at the police station. Their conversation was secretly tape-recorded. During that conversation, defendant at first told Smith he did not know who the shooter was. Later, he told her the shooter was named

"Steve" but that he did not know his last name.[18] He also claimed, falsely, that he had already told the police all he knew. When Smith asked him what he had said to police about their being together on the day of the murders, defendant said he told police they had always been together, "[d]ay and night." This, too, was false, since he had left Smith long enough to accompany Hicks to the drug transaction and participate in three murders.

Defendant now claims these statements, elicited by the prosecution during defendant's cross-examination, were hearsay and ought to have been excluded. Inasmuch as defendant offered no objection to most of these statements at trial—and the objections he did make, most of which were sustained, related only to vagueness—he has forfeited the claim. (*Drake v. Dean* (1993) 15 Cal.App.4th 915, 933 [19 Cal.Rptr.2d 325].)[19] We also reject the claim on the merits, since these statements were not offered for their truth. Indeed, the statements were offered for their *falsity* to rebut defendant's claim that he had lied to the police only because he "figured the less I tell them, the less they would know, and they would just let me go from there." The conversation with Smith showed that defendant continued to offer many of the same lies to his girlfriend even when the stated reason was inapplicable—and thus that defendant's stated reason for lying to the police was untrue.

Defendant's claim that the prosecutor committed misconduct when he asked defendant whether Smith "was to be [his] alibi" was preserved by a timely objection, but it is meritless, since the record supports the inference that defendant did intend to use her as such. In his police interview, defendant had denied even being present at the crime scene, telling them instead that he had been with Smith the entire time, either in person or on the phone. Defendant changed his story only after learning that Smith had told the police he had been at the motel.[20] Smith thus *had* been his alibi up to that point. No misconduct appears. (*People v. Hughes* (2002) 27 Cal.4th 287, 388 [116 Cal.Rptr.2d 401, 39 P.3d 432].)

Finally, we discern no prejudicial error in the trial court's decision to admit into evidence only the transcript of the couple's conversation and not the tape, which both sides agreed was of poor quality, difficult to hear, and overlaid by the comments of the police officers secretly listening to the conversation. Indeed, defendant fails to identify any discrepancy between the

---

[18] At trial, defendant admitted that these statements were lies.

[19] Defendant's claim, presented here for the first time, that the trial court erred under Evidence Code section 352 in admitting these statements is likewise forfeited. It is also meritless, for the reasons given in the text.

[20] Defendant *did* make a hearsay objection to Smith's statement that she told the police that defendant had been present, but the trial court properly overruled it and instructed the jury that the statement was offered merely to show that defendant heard the statement, not for its truth.

tape and the transcript or articulate any other way in which the jury's failure to hear the tape prejudiced him. Defendant instead asserts that the jury needed the tape to understand the voice intonations indicating that Smith was angry with him and just wanted him to tell the truth, but (as defense counsel admitted) her feelings were evident from the transcript itself and (as the trial court pointed out) the defense could have brought that point out more plainly on her redirect examination. Defendant's contention that the sotto voce comments of the eavesdropping officers were relevant to establish their state of mind during their subsequent interviews with defendant is undone by the fact that the state of mind of any officer was irrelevant.

### 6. *Prosecution's Refusal to Accept Defense Stipulation*

When the prosecutor indicated that he intended to call Steve Hicks's father, Henry Hicks, to demonstrate that Steve Hicks was right-handed, defense counsel offered to stipulate to that fact. The prosecutor declined to accept the stipulation, the trial court declined to force it on the prosecution, and Henry Hicks then testified as to Steve Hicks's height, weight, hairstyle, and handedness. We need not decide whether the trial court ought to have compelled acceptance of the stipulation because the father's testimony that his son was right-handed certainly "had no potential to inflame the jurors and hence could not have exposed defendant to prejudice." (*People v. Bonin* (1989) 47 Cal.3d 808, 849 [254 Cal.Rptr. 298, 765 P.2d 460].)

### 7. *Admission of Conversations Between Cunningham and Barnes Under Coconspirator Hearsay Exception*

Part of Cunningham's testimony consisted of recounting his conversations with Barnes and Stevenson concerning the drug deal. The trial court admitted these statements under Evidence Code section 1223, the coconspirator exception to the hearsay rule. Defendant contends the trial court erroneously admitted the conversations between Cunningham and Barnes and thereby violated section 1223 as well as his rights under the Fifth, Sixth, and Fourteenth Amendments.

Although defendant objected successfully on hearsay grounds to the prosecution's inquiry into Cunningham's first contact with Barnes, he made no objection to any actual coconspirator statements once the prosecution elicited the fact of the conspiracy through independent evidence. We thus conclude that defendant has forfeited his objections. (Evid. Code, § 353.) Defendant also failed to preserve his constitutional claims by failing to object on any of these grounds in the trial court. (*People v. Earp, supra,* 20 Cal.4th at p. 893.)

Defendant's claims fare no better on the merits. As best we can understand, defendant has two objections: that his involvement in the conspiracy had not yet been established at the time the prosecution sought to

introduce the statements under the coconspirator exception, and that the challenged statements preceded defendant's agreement to participate in the conspiracy. The objections are legally meritless. Although coconspirator statements may be offered after the admission of evidence sufficient to establish the conspiracy and the participation of the declarant and the defendant, a trial court may *also*, in its discretion, admit the statements subject to the establishment of the requisite foundation. (Evid. Code, § 1223, subd. (c).) Defendant makes no claim the trial court abused its discretion and, given defendant's actual participation in the transaction as well as his own testimony concerning his agreement to participate in it, no abuse of discretion appears. In addition, the jury was instructed that the coconspirator statements could not be considered without a determination, from independent evidence, that a conspiracy existed.

Likewise, it is irrelevant that some of the coconspirator statements allegedly preceded defendant's involvement in the conspiracy. Once independent evidence to establish the prima facie existence of the conspiracy has been shown, all that is needed is a showing " 'that the *declarant* was participating in a conspiracy at the time of the declaration,' " " 'that the declaration was in furtherance of the objective of that conspiracy,' " and " 'that at the time of the declaration the party against whom the evidence is offered was participating *or would later participate* in the conspiracy.' " (*People v. Hardy* (1992) 2 Cal.4th 86, 139 [5 Cal.Rptr.2d 796, 825 P.2d 781], italics added; Evid. Code, § 1223, subd. (b).) Defendant does not dispute that Cunningham and Barnes were participants in the conspiracy at the time the challenged statements were made, nor does he dispute that he joined the conspiracy after the challenged statements were made. Accordingly, no error occurred.

### 8. *Admission of Victim Photographs and Mannequins Used to Depict Bullet Wounds*

Prior to opening statements, defendant objected to some of the photographs depicting the murder victims. Specifically, defendant objected to the admission of three photographs of Brown (People's exhibits 3-B, 3-C, 3-F),[21] the admission of three photographs of Barnes (People's exhibits 4-B, 4-C, 4-G), and the admission of more than two or three of eight autopsy photographs of Stevenson (People's exhibits 8-B through 8-I). As to the Brown photographs, the trial court sustained the objection as to one photograph (exhibit 3-B) as

---

[21] Defendant purported to "renew" his objection to an additional photograph of Brown (People's exhibit 3-E) at the close of the People's case, but he had explicitly refrained from making such an objection earlier and thereby forfeited the objection. (*People v. Boyette* (2002) 29 Cal.4th 381, 423–424 [127 Cal.Rptr.2d 544, 58 P.3d 391].) Inasmuch as the jury had already seen the photograph, defendant also could not have been prejudiced by its admission into evidence. The same is true of an additional photograph (People's exhibit 4-F) of Barnes.

duplicative but found the other two were probative in that they showed where the bullets entered Brown's clothing and body. As to the Barnes photographs, the trial court again sustained the objection as to one photograph (exhibit 4-B) as duplicative but found the other two showed the entry wounds at different distances and were therefore sufficiently probative. As to the Stevenson photographs, the trial court overruled the objections, finding that they could assist the jury in understanding the testimony of the coroner and were not particularly gruesome or offensive. Defendant renews his objections here and, for the first time, adds that the photographs violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Defendant's claims fail on the merits.

■■■■ "The admission of allegedly gruesome photographs is basically a question of relevance over which the trial court has broad discretion. [Citation.] 'A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value.' " (*People v. Roldan* (2005) 35 Cal.4th 646, 713 [27 Cal.Rptr.3d 360, 110 P.3d 289].) We have examined the photographs in question and conclude the trial court did not abuse its discretion. They are not unduly bloody or gruesome and are relevant to the manner in which each victim was killed. "As we have previously noted, ' " 'murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant.' " ' " (*Ibid.*)

Nor is defendant's claim of prejudice any stronger when combined with the three mannequins, which were used to illustrate the coroner's testimony and the prosecution's theory that Stevenson's injuries were consistent with a left-handed shooter. As the trial court observed, these were "waist-and-above mannequins that look like mannequins from any department store," provided a perspective concerning the entry and exit wounds that could not be provided by the photographs or the testimony, and were "not particularly gruesome in that they don't appear to be very realistic." Once again, no error appears. (*People v. Riel, supra,* 22 Cal.4th at p. 1195; see *People v. Gurule, supra,* 28 Cal.4th at p. 624.)

### 9. Admission of Detective Corrigan's Testimony Concerning Absence of Shell Casings

Detective Corrigan testified that the absence of shell casings at the crime scenes was consistent with the use of a revolver and inconsistent with a semiautomatic handgun, unless the shell casings had been gathered up. Defendant, who objected only on the ground of "speculation" at trial, now argues that there was an insufficient foundation that Corrigan had the requisite expertise to offer such an opinion. Although the claim is forfeited

because defendant did not articulate this ground below (*People v. Raley* (1992) 2 Cal.4th 870, 892 [8 Cal.Rptr.2d 678, 830 P.2d 712]), we also reject it on the merits. The prosecution established that Corrigan, a police detective, was "familiar with the use of firearms," which enabled him to offer this opinion. (See *State v. Bowles* (Minn. 1995) 530 N.W.2d 521, 526; *Fort v. State* (Miss.Ct.App. 1999) 752 So.2d 458, 460.) Moreover, defendant does not identify any way in which this testimony could have prejudiced him.

### 10. *Admission of Defendant's Testimony Supplying Hicks's Name*

On June 9, the day after his arrest, defendant was readvised of his *Miranda* rights and waived them. During the interview, defendant told Detective Corrigan that Barnes and a man named "Steve" had asked him to "go along" on a drug deal. When Corrigan asked whether defendant could obtain Steve's last name, defendant said he thought he could if he made some phone calls. Defendant was brought to a room with a phone. After he made a few calls, he told Corrigan the man's last name was "Hicks." At trial, defendant admitted that he had known Hicks's name all along, since he had known Hicks for five years. Defendant contends that Hicks's name was obtained in violation of his *Miranda* rights and was, in any event, irrelevant.

As to the *Miranda* claim, the trial court conducted a hearing as to the circumstances of defendant's identification of Hicks and determined that the police conducted no interrogation of defendant and used no other tactics to elicit the identification following the phone calls. This finding is amply supported by the record. (*People v. Waidla* (2000) 22 Cal.4th 690, 730 [94 Cal.Rptr.2d 396, 996 P.2d 46]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1033 [60 Cal.Rptr.2d 225, 929 P.2d 544].) Detective Corrigan testified that defendant identified Hicks after making a few phone calls and that no questions were asked of him to elicit the identification. Whether viewed as a volunteered statement (*People v. Ray* (1996) 13 Cal.4th 313, 337 [52 Cal.Rptr.2d 296, 914 P.2d 846]) or as a continuation of the prior interview (*People v. Visciotti* (1992) 2 Cal.4th 1, 54 [5 Cal.Rptr.2d 495, 825 P.2d 388]), defendant was not entitled to a readvisement of his *Miranda* rights before he could announce the product of his labors.

As to the claim that the evidence was irrelevant, we disagree. Defendant's knowledge that Hicks was present linked defendant more closely to the crimes than did his original police statements—and his feigned ignorance of Hicks's identity cast doubt on his subsequent police statements admitting only limited involvement in the murders.

### 11. *Cumulative Error*

As detailed above, we have found very few errors, and each of those is clearly harmless. We therefore reject defendant's claim of cumulative error.

## IV. Penalty Phase Issues

### A. *Failure to Conduct Evidentiary Hearing Concerning Claim of Alleged Spectator Misconduct*

At the close of the prosecution's case during the penalty phase, defense counsel asked to put on the record a comment allegedly uttered by Tenoa Stevenson's mother two weeks earlier, when the guilt phase verdicts were announced: "I wasn't aware of it until today, but apparently I'm told at the time after the jury had announced their verdict, that Mrs. Stevenson said something to the effect of, 'Thank you, Jesus. Kill him,' or something like that in front of the jury. [¶] I didn't hear that myself. I had a report that that happened. I don't know if anybody else heard it or not." Neither cocounsel, the prosecutor, nor the court heard the alleged comment, either. No one asked the jurors be examined to determine whether they heard the comment, nor did anyone ask the jury be admonished about it.

 Defendant now claims the trial court violated his rights under the Sixth and Fourteenth Amendments in failing to conduct an evidentiary hearing to determine whether the reported event occurred and, if so, the impact it had on each of the jurors and the appropriateness of giving curative instructions. But defendant failed below to object to the alleged comment, failed to request a hearing to determine whether the jury heard any such comment, and failed to request a curative admonition. He has thereby forfeited the claim of spectator misconduct. (*People v. Hill* (1992) 3 Cal.4th 959, 1000 [13 Cal.Rptr.2d 475, 839 P.2d 984], overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].) Even assuming the claim had been preserved—and even assuming the comment was made and was heard by the jury—defendant cannot establish prejudice. The question here is whether what the jury might have heard "was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged [conduct] is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." (*Holbrook v. Flynn* (1986) 475 U.S. 560, 572 [89 L.Ed.2d 525, 106 S.Ct. 1340].) Although Mrs. Stevenson's opinion was not admissible on the question of penalty (*People v. Smith* (2003) 30 Cal.4th 581, 622 [134 Cal.Rptr.2d 1, 68 P.3d 302]), we are skeptical the jury would have paid any mind to her brief and unsurprising comment. (*Whitehead v. State* (Ala.Crim.App. 1999) 777 So.2d 781, 848–849; *Wood v. State* (Okla.Crim.App. 1998) 1998 OKCR 19 [959 P.2d 1, 12].)

Because defendant could not have been prejudiced, we also reject defendant's claim that his attorney was ineffective in failing to request an evidentiary hearing to investigate the allegation. Moreover, defense counsel could

reasonably have decided to forgo a hearing to avoid calling attention to a comment the jurors may not have even heard.

### B. *Lack of Notice of Factors in Aggravation Under Section 190.3*

Following the guilt phase verdicts, defense counsel asked the trial court to prohibit the People from offering any penalty phase evidence on the ground that he had received "no formal notice of aggravated factors." The prosecutor responded that the only evidence the People intended to introduce was the Reed murder, which was the basis for the prior-murder-conviction special circumstance and for which Attorney Wehrmeister, defendant's current attorney, was counsel of record. The prosecutor also stated that he had supplied all the discovery "both for the guilty phase and the penalty phase" prior to the commencement of the trial. Defense counsel maintained this was inadequate since, in his view, "the law requires that we be notified . . . in writing prior to the conclusion of the guilt phase."

Two weeks later, before the penalty phase began, the prosecutor served defendant with a written notice of the evidence to be introduced in aggravation. The prosecutor added that he had had off-the-record discussions with both attorneys for the defense before and during the guilt phase, that he had informed them of his intent to introduce evidence of the Reed murder if the penalty phase was reached, and that they had received actual notice of that crime because it had been alleged as a special circumstance in the information. Defense counsel continued to object to the admission of any evidence beyond the mere fact of the conviction. The trial court denied the defense motion, relying on the "unusual" circumstance that current defense counsel had been defendant's counsel in the trial on Reed's murder and was therefore familiar with the facts of that case, the fact the Reed murder had been charged as a special circumstance in the guilt phase, and the resulting lack of prejudice to the defense. The trial court also stated that it would grant a defense request for a continuance as the need arose. Finally, the trial court barred the prosecution from presenting any other evidence in aggravation.

On appeal, defendant renews his claim that the lack of adequate notice violated state law and deprived him of fundamental due process under the federal Constitution. The admission of the facts surrounding the Reed murder as aggravating evidence is subject to the notice requirement in section 190.3: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." We need not decide whether the prosecution's

notice was timely under this provision because it is clear that defendant suffered no prejudice. (*People v. Wilson* (2005) 36 Cal.4th 309, 357 [30 Cal.Rptr.3d 513].)

■ "The purpose of the notice provision is to afford defendant an opportunity to meet the prosecutor's aggravating evidence." (*People v. Taylor, supra*, 26 Cal.4th at p. 1182.) Defendant had that opportunity in the unusual circumstances here, inasmuch as the Reed murder had been charged as a special circumstance, defense counsel was familiar with the underlying facts because of his representation of defendant in the prior case, and the defense was offered a continuance as necessary to meet the aggravating evidence. (*People v. Taylor* (1990) 52 Cal.3d 719, 737 [276 Cal.Rptr. 391, 801 P.2d 1142] [because the evidence in aggravation "consisted of crimes charged in the information as prior convictions for enhancement purposes," defendant had "actual notice"].) Defendant did not request a continuance, nor does he now explain how he could have rebutted or impeached any of the three prosecution witnesses at the penalty phase had he received notice earlier. (*People v. Wilson, supra*, 36 Cal.4th at p. 357; *People v. Roldan, supra*, 35 Cal.4th at p. 734.) Any delay in notifying the defense of the evidence in aggravation or in identifying witnesses was therefore harmless. (*People v. Mayfield, supra*, 14 Cal.4th 668, 799.)

These circumstances are thus unlike those in *Com. v. Wesley* (2000) 562 Pa. 7 [753 A.2d 204], on which defendant relies. In *Wesley*, defense counsel had no actual notice the prosecution would rely on the circumstance of torture and the trial court denied counsel's request for a continuance to obtain an expert to testify about the existence of torture. (*Id.* at pp. 212, 215–216.) Here, by contrast, defendant had actual notice of the evidence in aggravation and never requested a continuance to prepare to meet it.

### C. *Failing to Strike Evidence of Unadjudicated Violent Conduct*

Defendant's mother, Diane, and his grandmother, Jessie Compton, testified that defendant was a nonviolent person. In seeking to impeach these witnesses, the prosecutor inquired whether they had heard of acts or conduct inconsistent with that character trait. Defendant claims this was an improper effort to place before the jury unadjudicated violent conduct as an aggravating factor in favor of death, in violation of the limits the trial court had imposed on evidence in aggravation, and justifies reversal of the death sentence. We disagree.

Diane and Jessie Compton were offered as witnesses by the defense to humanize defendant in the eyes of the jury. Each testified about the disadvantages defendant had faced in his childhood and the good things he was

nonetheless able to accomplish. The prosecutor, on cross-examination, challenged the portrait these witnesses sought to portray. For example, after Diane testified that she had never known defendant to exhibit any violent behavior or to carry a firearm, the prosecutor inquired whether Diane remembered "the date of August 6, 1988, about five or six weeks after the incident at the Monterey Park motel." Defendant objected and requested a sidebar, at which the prosecutor explained that defendant had been arrested with a firearm on his person on that date in his mother's presence. Diane then testified, outside the presence of the jury, that she did not see the gun on that occasion but had been told by the police that defendant had one. After the trial court overruled the objection, Diane testified in front of the jury that a sheriff's deputy did tell her on that date that defendant had a gun on his person when he was arrested.

Then, when Diane denied ever seeing defendant shoot anyone, the prosecutor asked whether she remembered being assaulted and robbed outside a store about two weeks before defendant's arrest and whether she knew a man named Irwin Jones. When the prosecutor asked what happened after the robbery, defendant again objected. At sidebar, the prosecutor explained that Diane had earlier told a detective that she drove back to the scene with defendant and pointed out the robber and that defendant knocked him down with a shotgun and shot him in the groin. Diane was then permitted to testify before the jury that she had been robbed near a store in Long Beach, that she knew the robber from the neighborhood, and that she went home and told defendant what had happened. But when the prosecutor asked Diane what happened after that, Diane claimed she could not remember what occurred because of her drinking problem and denied, in particular, pointing out the robber to defendant.

Similarly, after Jessie Compton testified that she had never known defendant to show any signs of violence or to carry a gun, the prosecutor asked Compton over defense objection whether she was "aware of an incident involving your daughter, Diane . . . , where she was robbed by a man and [defendant] later allegedly knocked the man down and shot him." Compton said she knew Diane had been robbed but did not know what happened after that. When the prosecutor sought to ask whether she had ever been contacted by Deputy Elizabeth Smith on November 26, 1988, regarding the shooting of Joe Hawkins, the defense objected and another sidebar was held. The prosecutor explained that Hawkins was the victim of a drive-by shooting, that defendant was identified as one of the shooters by eyewitnesses, that Compton had been told defendant was a suspect, and that she supplied defendant with an alibi during the time of the shooting. The trial court sustained the defense objection, struck the question, and directed the jury to disregard it. The jury was also instructed at the end of the case that evidence of other incidents when defendant "may have" possessed a firearm, elicited

during Diane's testimony, "was allowed on the issue of the witness' credibility and not for any other purpose. You are not to consider it as an aggravating factor on the issue of penalty."

 "When a defense witness gives character testimony, the prosecutor may inquire of the witness whether he or she has heard of acts or conduct by the defendant inconsistent with that testimony, so long as the prosecutor has a good faith belief that such acts or conduct actually took place." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1170 [74 Cal.Rptr.2d 121, 954 P.2d 384].) Evidence of weapons possession, as well as evidence of violent conduct, "would reasonably implicate a violent character." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1173 [64 Cal.Rptr.2d 892, 938 P.2d 950].) Once these witnesses testified that, to their knowledge, defendant had never exhibited any violent behavior, the prosecutor was entitled to cross-examine them about specific instances of defendant's violent behavior.

Significantly, defendant nowhere claims these incidents were not admissible to impeach his character witnesses at the penalty trial. Nor does he claim the prosecutor lacked a good-faith basis for inquiring about these incidents. (See *People v. Clair, supra,* 2 Cal.4th at pp. 683–684.) He claims instead that the prosecutor improperly elicited testimony from these two witnesses with the sole intent of impeaching them with otherwise inadmissible evidence. We note, preliminarily, that defendant failed to object on this basis below and has thus forfeited the claim. We also reject the claim on the merits. Defendant relies on *U.S. v. Gomez-Gallardo* (9th Cir. 1990) 915 F.2d 553, where the court found error when the prosecution had called a codefendant for the sole purpose of impeaching him with otherwise inadmissible evidence. (*Id.* at pp. 555–556.) Here, by contrast, both witnesses were called by the *defense.* The prosecution was entitled to counter the evidence of good character offered by these witnesses by exploring evidence of defendant's bad character, including defendant's violent character. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1024 [108 Cal.Rptr.2d 291, 25 P.3d 519].) Based on the crimes of which defendant had been convicted as well as the evidence detailed above, the prosecutor had a reasonable basis for believing the witnesses would acknowledge defendant's violent character. It was only after the witnesses *denied* this character trait that the prosecutor sought to impeach them with specific instances of violent conduct. This was not improper, especially since defendant did not object when the prosecution elicited his relatives' beneficial testimony denying that he had a violent character.

Defendant's reliance on cases barring the prosecutor from impeaching a witness on a collateral matter is inapposite, since defendant's violent character was not collateral to the issue being decided at the penalty phase. Defendant's claim of error based on a lack of notice is likewise without

merit. "The prosecutor did not engage in misconduct in failing to raise the issue *in limine*; the primary concern in restricting impeachment inquiry of this nature is with the good faith belief in its foundation." (*People v. Ramos*, *supra*, 15 Cal.4th at p. 1173.) As stated above, defendant does not challenge the prosecutor's good faith.

Defendant also claims that these specific incidents were offered as unadjudicated violent conduct under section 190.3, factor (b) without providing the defense with the notice required by section 190.3 and without informing the jury these incidents could be considered as evidence in aggravation only if it found them true beyond a reasonable doubt. He claims a violation of his rights under the Fifth, Sixth, and Eighth Amendments. We agree that these specific incidents were not admissible as evidence in aggravation under section 190.3, but no error appears. The jury was instructed specifically that these incidents could not be considered as aggravating factors and might be considered only as impeachment.

Finally, even if error occurred, it was harmless. Other than Diane's recollection that a sheriff's deputy had told her defendant had a gun on his person when he was arrested, the witnesses denied knowledge of any of the facts the prosecutor allegedly attempted to elicit. In addition to instructing the jury that defendant's alleged possession of a firearm could not be considered as an aggravating factor, the trial court gave CALJIC No. 1.02, which states that "[a] question is not evidence," that the jury must not assume to be true any insinuation suggested by a question, and that it must disregard any evidence ordered stricken by the court. Furthermore, no reference was made to any of these incidents in closing argument.

For the same reasons, we find the trial court did not abuse its discretion in denying defendant's motion for a mistrial.

### D. *Alleged Prosecutorial Misconduct During Closing Argument*

Defendant assigns error to a variety of comments uttered by the prosecutor during argument. As detailed below, a great number of these claims are not cognizable on appeal because defendant failed to interpose a contemporaneous objection. Defendant's reliance on *People v. Hill, supra*, 17 Cal.4th 800 to excuse his default is unavailing. "There the prosecutor subjected the defense 'to a constant barrage of . . . unethical conduct, including misstating the evidence, sarcastic and critical comments demeaning defense counsel, and propounding outright falsehoods,' and the trial court consistently failed to curb the prosecutor's excesses. (*Id.* at p. 821.) Such egregious conduct did not occur here." (*People v. McDermott* (2002) 28 Cal.4th 946, 1002 [123 Cal.Rptr.2d 654, 51 P.3d 874].)

We also find that these claims, singly or in combination, do not warrant a new penalty trial.

### 1. *Taking Into Account "Any Criminal Activity"*

In discussing the aggravating factors the jury could consider, the prosecutor stated that, under the second aggravating factor, the jury "can take into account *any* criminal activity which the defendant has been involved in that came out during the guilt phase or penalty phase of the trial." This was inaccurate, inasmuch as "[e]vidence of nonviolent criminal activity that did not result in a felony conviction is, as defendant claims, inadmissible as an aggravating factor." (*People v. Visciotti, supra,* 2 Cal.4th at p. 72.) The jury could not have been misled, however. Defendant promptly objected and, following a sidebar conference, the prosecutor corrected himself and stated that "the second element is presence or absence of criminal activity by the defendant, other than the crimes for which the defendant has been tried in the present proceeding, which involve the use or attempted use of force or violence or the express or implied threat to use force or violence." Also, by failing to request a curative admonition, defendant has forfeited any further challenge to the prosecutor's momentary misstatement.

### 2. *Misstating Weighing Process*

The prosecutor argued to the jury, correctly, that "before you can consider the death penalty, you must find that the factors in aggravation substantially outweigh the factors in mitigation." The prosecutor then turned to the mitigating factors: "If you find that mitigating factors as presented to you in the underlying case, the guilt phase of this trial and the penalty phase, outweigh the aggravating factors, then you cannot consider the death penalty." Defense counsel objected to this characterization, pointing out at sidebar that this description of the process was incomplete. The prosecutor promptly agreed to and did clarify the point to the jury: "Let me modify what I said before. [¶] . . . In order to find the death penalty, you must find that the aggravating factors must substantially outweigh the mitigating factors, and if you find that it does not, then you cannot consider the death penalty." Once again, the jury could not have been misled and, by failing to request a curative admonition, defendant has forfeited any further challenge to the original misstatement.

We also reject the contention that the prosecutor, in warning jurors that defendant's prior criminal conduct could not be counted twice under factors (b) and (c) of section 190.3, urged the jury to perform a mechanical counting of factors.

### 3. *Basing Decision on a "Gut Reaction"*

In explaining how the penalty jury should approach its task, the prosecutor stated that "[t]he decision is really your discretion. The only criteria you need to use is your view of the world, your heart, your soul, your gut reaction . . . . [¶] You may also consider sympathy and mercy." Defendant, who objected below, argues that the reference to a "gut reaction" invited the jury to rest its decision on the arbitrary and capricious basis condemned in *Furman v. Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]. The prosecutor's remarks, understood in context, do not support defendant's characterization. The prosecutor was describing the decision process "once you make this initial determination" that the aggravating factors substantially outweigh the mitigating factors and that such a decision would depend on the jurors' view of the world, their hearts, their souls, and their gut reactions—in sum, that the jurors would need to make a profound decision in consultation with their consciences. (See *People v. Dennis* (1998) 17 Cal.4th 468, 548 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; *People v. Turner* (1990) 50 Cal.3d 668, 710–711 [268 Cal.Rptr. 706, 789 P.2d 887].) The prosecutor's reference to a "gut reaction," in combination with the other factors, in no way suggested the jurors should make a quick or arbitrary choice.

### 4. *Alleged* Caldwell *Error*

In *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], the prosecutor argued to the jurors that theirs was not the final decision as to life or death, but that the case would be reviewed by an appellate court. The United States Supreme Court reversed the penalty determination, holding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Id.* at pp. 328–329.) Defendant complains that the prosecutor violated *Caldwell* here by telling the jury that the responsibility for imposing death rested not with the jurors but with the law and defendant's conduct in committing the murders. " 'In determining whether *Caldwell* error has occurred, "[w]e do not reach our conclusion based on any single statement uttered by the prosecutor. Rather, we consider the instructions of the court and the arguments of both prosecutor and defense counsel." [Citation.] We also must consider the prosecution's statements within the overall context of its closing argument. [Citation.]' " (*People v. Young, supra,* 34 Cal.4th at p. 1221.)

Defendant focuses in particular on the prosecutor's statements that the death penalty is "on the books today, it's the law in this state, it's to be imposed in this case, if you find that aggravating substantially outweigh the

mitigating factors" and that "[i]t was defendant's decision and his actions which has led to this. [¶] So don't necessarily assume total and whole responsibility for your decision. You are just interpreting the facts, applying the law, as it's given to you by the judge." We have already held, however, that a prosecutor, without running afoul of *Caldwell*, may suggest " 'that the moral blame for the crimes and their consequences rests with defendant, not with the jurors.' " (*People v. Clark* (1993) 5 Cal.4th 950, 1036 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

Defendant contends that *Clark* is distinguishable in that the prosecutor here "strongly implied . . . that in this case the law *required* imposition of the death penalty," but we do not accept defendant's characterization of the prosecutor's argument. The prosecutor had already explained to the jury that a finding the aggravating factors substantially outweighed the mitigating factors was necessary—yet not sufficient—to warrant a death sentence and that the choice in such a circumstance was left to their discretion. Accordingly, by saying "it's to be imposed in this case if you find that aggravating substantially outweigh the mitigating factors," the prosecutor was merely describing the People's position as to the appropriate penalty, not announcing a rule of law. There was thus no reasonable likelihood the prosecutor's argument misled the jury regarding its responsibility in selecting an appropriate penalty. (*People v. Young, supra,* 34 Cal.4th at p. 1222; cf. *People v. Milner* (1988) 45 Cal.3d 227, 254 [246 Cal.Rptr. 713, 753 P.2d 669] [prosecutor's argument "did not so much shift the jury's responsibility as negate its existence"].)

### 5. *Comparing This Case with Other Cases*

The prosecutor's argument contrasted the circumstances of defendant's crimes with a murder "where a person goes into a restaurant with a gun or machine gun and opens fire on the people eating in the restaurant" or "where a man who has been working and has no criminal history for a period of thirty years, coming home one day and all of a sudden murdering his wife and children." In the latter instances, "where a person sort of snaps emotionally or mentally for no cause at all," the jury would know "that there must be something there, some form of mitigation that you can consider in those types of crimes." In this case, the prosecutor continued, "[t]hese murders were committed with the base antisocial aim," "for the purpose of taking money from the victims," and "required substantial planning and premeditation." The prosecutor's characterization of defendant's purpose was a fair comment on the evidence, and his effort to highlight the heinous and unjustifiable nature of defendant's crimes by reference to generic murders presenting different fact patterns was not improper. (*People v. Lucas* (1995) 12 Cal.4th 415, 499

[48 Cal.Rptr.2d 525, 907 P.2d 373].) The prosecutor nowhere asked the jury to consider the punishment meted out to persons other than defendant. (Cf. *id.* at p. 498.)

### 6. *Alleged Appeal to Passion and Emotion*

Defendant contends the prosecutor improperly urged the jury to rely on "just retribution" and "controlled vengeance" in arriving at a verdict of death. It is true that the prosecutor mentioned those concepts, but not to justify imposition of the death penalty. A review of the prosecutor's comments reveals that his reference to "just retribution" was a description of human nature, not the criminal justice system. Indeed, the prosecutor went on to explain that "[r]etribution and controlled vengeance should not be any longer the sole or the dominant objective of the criminal law."

Defendant also errs in contending that the prosecutor's invocation of "anarchy" and "vigilante justice" led the jury to base its decision on caprice or emotion, rather than on reason. Defendant forfeited his challenge to these remarks by failing to object below. In any event, the prosecutor did not argue that the jury should find that death was an appropriate punishment *because* of these concerns. Rather, the prosecutor briefly suggested that *if* the jury found that death was the appropriate punishment, it should not be afraid to impose it. (See *Garland v. Com.* (Ky. 2003) 127 S.W.3d 529, 542–543.) At one point the prosecutor did state that a refusal to impose death for a case "as serious and aggravated as this one cheapens all our lives across the board because society is full of morally deficient people who are morally deficient, . . . who suffer no remorse for the suffering of other people or concern for aggrieved survivors," but defendant did not object and thereby has forfeited the claim of error. (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1106 [259 Cal.Rptr. 630, 774 P.2d 659].) Moreover, the jury was informed, in response to a juror question, that it could not consider whether the death penalty "will or will not deter present or future criminal activity." Thus, even assuming an improper reference there to notions of general deterrence, we do not discern in this sentence any of the aggravated features we have found prejudicial in other cases. (*People v. Varnum* (1969) 70 Cal.2d 480, 488 [75 Cal.Rptr. 161, 450 P.2d 553]; see generally *People v. Davenport* (1995) 11 Cal.4th 1171, 1222 [47 Cal.Rptr.2d 800, 906 P.2d 1068] [" ' "[i]solated, brief references to retribution or community vengeance . . . , although potentially inflammatory, do not constitute misconduct so long as such arguments do not form the principal basis for advocating the imposition of the death penalty" ' "].)

Finally, the prosecutor's reference to defendant's failure to show remorse did not constitute misconduct. "[T]he presence or absence of remorse is a factor ' "universally" deemed relevant to the jury's penalty determination.' " (*People v. Marshall, supra,* 13 Cal.4th at p. 855.) The prosecutor

nowhere asked the jury to consider the lack of remorse to be an aggravating factor. We have also held that remarks of this type did not constitute improper comment on a defendant's exercise of his privilege against self-incrimination. (See *People v. Ghent* (1987) 43 Cal.3d 739, 770–771 [239 Cal.Rptr. 82, 739 P.2d 1250].) Defendant, moreover, neither objected nor sought an admonition to the jury to disregard the comment, and thereby cannot complain on appeal about it. (*Marshall, supra,* 13 Cal.4th at p. 855.)

### 7. Stating That Defendant Deserved Same Sympathy and Mercy as He Showed His Victims

The prosecutor told the jury that defendant had tried to offer evidence to instill a sense of sympathy but argued that defendant instead deserved "the same sympathy and mercy" that he had shown to each of his four murder victims. Defendant now claims this was misconduct, but he forfeited the claim by failing to object to the prosecutor's remarks. In any event, this was proper argument. (*People v. Hughes, supra,* 27 Cal.4th at p. 395; *People v. Ochoa* (1998) 19 Cal.4th 353, 464–465 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

### 8. Alleged Misuse of Character Evidence

Defendant next finds error in various comments by the prosecutor relating to character evidence offered by the defense. Defendant forfeited each of these claims by failing to object to these comments below. (*People v. Wader* (1993) 5 Cal.4th 610, 658–659 [20 Cal.Rptr.2d 788, 854 P.2d 80].) Defendant's claims are also without merit.

The defense offered some speculation that defendant's uncle had been killed because he was a drug dealer and that defendant had been affected emotionally by his murder. In argument, the prosecutor reasoned that "if you were close to a dope dealer and that dope dealer was stabbed to death, that should be a deterrent to that type of lifestyle. [¶] That didn't stop the defendant." This was not error, since the prosecutor was merely arguing that the evidence offered by the defense had little mitigating value. (*People v. Caro* (1988) 46 Cal.3d 1035, 1062 [251 Cal.Rptr. 757, 761 P.2d 680].)

Nor do we find error in the prosecutor's assertion that the mitigating evidence presented was insufficient and "a concoction of half-truths presented by well-intentioned individuals who are caring but misguided," that defendant would not be entitled to mercy even if his mitigating evidence had been true, and that defense counsel had no additional mitigating evidence. These remarks were fair comment on the evidence, not an attack on defense counsel's integrity. (*People v. Bemore, supra,* 22 Cal.4th at p. 846.)

The prosecutor arguably did err, however, in stating that defendant was a drug dealer with an "explosive" personality that he inherited from his mother

and in speculating about "the lives that must have been destroyed" by his drug dealing. Although defendant forfeited his challenge to these statements by failing to object below, we also find no reasonable possibility that either point could have affected the penalty verdict in light of defendant's responsibility for four murders and the prosecutor's prompt reminder to the jury that these murders were the sole aggravating factors.

### 9. Alleged Misstatements of Record

Defendant claims that portions of the prosecutor's argument were not supported by the record. He complains first that the prosecutor improperly invited the jury to consider how Tenoa Stevenson felt and what he was thinking "as he helplessly stood in front of the defendant begging for his life just before he was killed by the defendant." This was not speculation, inasmuch as the record demonstrated that while Stevenson was running away from defendant and Hicks, he was yelling for help and trying to flag down passing cars. He also shouted, "Someone is trying to kill me." When defendant cornered Stevenson in the used car lot, Stevenson sank to the ground and begged defendant not to kill him. The argument was therefore proper (*People v. Jones* (1997) 15 Cal.4th 119, 188–189 [61 Cal.Rptr.2d 386, 931 P.2d 960]), as was the prosecutor's argument that what Stevenson experienced in that final minute "was worse than anything the defendant has presented to you during the entire penalty phase as to his entire life."

Defendant then claims the prosecutor erroneously sought to prevent the jury from considering whether defendant had acted under extreme duress or substantial domination by another person under section 190.3, factor (g). A review of the prosecutor's comments, however, reveals that he argued only that the jury "apparently did not believe" defendant's claim of duress by convicting him of the charged felonies. The prosecutor went on to say that "[y]ou can consider it if you wish, but I submit to you, you refuted that argument, that defense, at the guilt phase."

Finally, defendant complains about the prosecutor's argument that defendant planned to kill Landis Barnes. Defendant forfeited this claim by failing to object below, but we also find the challenged argument was fair comment on the evidence. The record supported a finding that defendant knew the drugs were fake and that Barnes, who was about to test the drugs in front of the would-be buyers when he was killed, did not. Barnes was shot twice—in the head and in the chest—under circumstances indicating an intentional shooting. Defendant may also have been concerned, as the prosecutor suggested, that Barnes could lead the buyers "back to the perpetrators of this robbery. So they had to kill Landis." The record thus supported the prosecutor's claim that "the perpetrators of this crime, this triple homicide, were planning to kill the setup man, Landis Barnes, their friend, from the very beginning."

E. *Alleged Instructional Error*

1. *Instructions Concerning Factor (c) of Section 190.3*

The People relied on defendant's prior convictions for murder, attempted murder, and assault with a firearm, entered on June 5, 1992, as evidence in aggravation. This evidence was offered under section 190.3, factor (b), as evidence of criminal activity involving the use or attempted use of force, and under factor (c), as evidence of prior felony convictions other than the crimes for which defendant has been tried in the current proceeding. As the Attorney General now concedes, this evidence was not admissible under factor (c), which is limited to those felony convictions "entered *before commission* of the capital crime." (*People v. Balderas, supra,* 41 Cal.3d at p. 201.) Defendant argues that the trial court therefore erred by including factor (c) among the factors the jury could consider under CALJIC No. 8.85 (Factors for Consideration). We discern no prejudice.

Defendant's prior convictions for murder, attempted murder, and assault with a firearm were still admissible under section 190.3, factor (b) as proof of criminal activity by defendant, other than that for which he was then on trial, which involved the use or attempted use of force or violence. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1374 [65 Cal.Rptr.2d 145, 939 P.2d 259].) The trial court allowed these convictions to be used under factor (b) and so instructed the jury. Consequently, the prosecutor's argument and the instructions concerning factor (c) could not have prejudiced defendant. It is inconceivable the jury could have found these convictions qualified as aggravating evidence under factor (c) but would not have made such a finding under factor (b). (*Bradford, supra,* 15 Cal.4th at p. 1374.)[22]

We are likewise unpersuaded by defendant's contention that the trial court erred prejudicially in failing to instruct the jury sua sponte that it may consider evidence of other crimes in aggravation only if such other crimes are proved beyond a reasonable doubt. As defendant concedes, the instruction is not required where, as here, "the defendant has already been convicted of the crime in question." (*People v. Ashmus* (1991) 54 Cal.3d 932, 1000 [2 Cal.Rptr.2d 112, 820 P.2d 214].) Defendant argues the instruction was nonetheless necessary because the prosecution, by offering Eula Roberson's testimony that defendant and Dwayne Reed (the murder victim) were friends,

---

[22] We also reject defendant's contention that his convictions for attempted murder and assault with a firearm could not be considered as aggravating factors under section 190.3, factor (b) because neither the convictions themselves nor their underlying facts were introduced at the penalty phase. The jury was entitled to rely on evidence admitted in the guilt phase, including these convictions, and was therefore properly instructed that these convictions, along with the Reed murder, constituted the aggravating factors.

went beyond the least adjudicated facts of the murder conviction. We have not yet decided whether a reasonable-doubt instruction is required where the People seek to prove "conduct" underlying the conviction other than the facts necessarily established (*id.* at p. 1001, fn. 25), but we need not resolve the matter here. Here, as in *Ashmus*, the People did not seek to prove conduct underlying defendant's murder conviction that appreciably exceeded the least adjudicated facts. (*Id.* at p. 1001.) We further note that defendant offered to *stipulate* to the fact about which he is now complaining, i.e., that defendant and Reed were friends. Defendant thus suffered no prejudice. (*People v. Kaurish* (1990) 52 Cal.3d 648, 707–708 [276 Cal.Rptr. 788, 802 P.2d 278].)

Finally, we reject defendant's claim that the trial court erred in allowing Roberson to opine that her nephew and defendant appeared to be friends. He offers no authority to suggest a lay witness is incompetent to offer an opinion as to friendship. Indeed, the defense itself offered lay opinions from defendant's mother and grandmother that he and Barnes were friends. In any event, the defense was allowed to cross-examine Roberson and expose the basis for her opinion to the jury, and the jury was instructed that it need not accept a lay opinion but should give it the weight, if any, to which it is entitled. Under these facts, her opinion, even if error, could not have been prejudicial.

### 2. *Instruction Concerning Sympathy*

The defense requested the following special instruction: "If the mitigating evidence gives rise to compassion or sympathy for the defendant, the jury may, based upon such sympathy or compassion alone, reject death as a penalty." The court denied the request, finding that it was redundant of other instructions. We find no error.

As defense counsel conceded, the role of sympathy is "said in many different ways" in the instructions that were given—"some ways fairly direct and some ways peripherally, but basically it talks about the sympathy thing." In CALJIC No. 8.85 (Penalty Trial—Factors for Consideration), the jury was instructed to take into account and be guided by the statutory factors, including factor (k) of section 190.3. This instruction allowed the jury to consider "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." At defendant's request, the jury was further instructed that they may "use mercy, sympathy and/or sentiment in deciding what weight to give each mitigating factor." In addition, the jurors were instructed, in accordance with CALJIC No. 8.88 (Penalty Trial—Concluding Instructions) that they were "free to assign whatever moral or sympathetic value [they] deem appropriate to each and all of the various factors you are permitted to consider."

The instructions given also explained the significance of a single mitigating circumstance, which necessarily included sympathy or compassion. At defendant's request, the jury was instructed that any one mitigating circumstance "may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case" and that "[a]ny mitigating circumstance presented to you may outweigh all the aggravating factors."

Because these instructions informed the jury that sympathy and compassion were legitimate factors for its consideration and that either alone could justify a sentence of life imprisonment without the possibility of parole, the trial court did not err in rejecting the defense special instruction. (*People v. Smith* (2005) 35 Cal.4th 334, 371 [25 Cal.Rptr.3d 554, 107 P.3d 229].)

### 3. *Instruction Concerning Absence of Mitigating Factor*

Defendant complains next that the trial court refused a special instruction that would have informed the jury that "[t]he absence of a statutory mitigating factor does not constitute an aggravating factor." "But as we have held, 'a reasonable juror could not have believed . . . that the absence of mitigation amounted to the presence of aggravation.' [Citation.] And, contrary to defendant's contention, nothing in the prosecution's argument noting the absence of various mitigating factors would have misled the jury to consider them as aggravating factors." (*People v. Vieira* (2005) 35 Cal.4th 264, 299 [25 Cal.Rptr.3d 337, 106 P.3d 990]; see also *People v. Stitely, supra,* 35 Cal.4th at p. 574.)

### 4. *Instruction Concerning Defendant's Background*

The trial court also refused a special instruction concerning defendant's background, which in pertinent part provided that "the evidence which has been presented regarding the defendant's background may only be considered by you as mitigating evidence." We have rejected the contention that the instructions should identify the various aggravating and mitigating evidence. (*People v. Martinez* (2003) 31 Cal.4th 673, 701 [3 Cal.Rptr.3d 648, 74 P.3d 748].) In any event, since the court correctly instructed the jury on aggravating and mitigating factors, it was not error to refuse the special instruction. (*People v. Ochoa* (2001) 26 Cal.4th 398, 457 [110 Cal.Rptr.2d 324, 28 P.3d 78].)

### F. *Constitutionality of California's Death Penalty Statute*

Defendant contends that the 1978 death penalty law under which he was sentenced violates the Fifth, Sixth, Eighth, and Fourteenth Amendments. As he concedes, we have rejected these claims before. We do again here. Thus, we

find that California's death penalty statute meaningfully narrows the pool of murderers eligible for the death penalty (*People v. Prieto* (2003) 30 Cal.4th 226, 276 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Burgener, supra,* 29 Cal.4th at p. 884 & fn. 7); that neither the breadth of the "circumstances of the crime" in factor (a) of section 190.3 nor disagreement about which circumstances are aggravating results in arbitrary or capricious application of the death penalty (*People v. Smith, supra,* 35 Cal.4th at p. 373); that jurors need not find beyond a reasonable doubt that a particular factor in aggravation exists, that the aggravating factors outweigh the mitigating factors, or that death was the appropriate penalty (*People v. Burgener, supra,* 29 Cal.4th at p. 885); that jurors need not make written jury findings or achieve unanimity as to aggravating circumstances (*People v. Bolden* (2002) 29 Cal.4th 515, 566 [127 Cal.Rptr.2d 802, 58 P.3d 931]); and that the jury need not be instructed as to any burden or standard of proof in selecting the penalty to be imposed (*People v. Jenkins* (2000) 22 Cal.4th 900, 1053–1054 [95 Cal.Rptr.2d 377, 997 P.2d 1044]). The decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] have not altered our conclusions regarding the standard of proof or unanimity. (*People v. Monterroso* (2004) 34 Cal.4th 743, 796 [22 Cal.Rptr.3d 1, 101 P.3d 956].)

We likewise find that prosecutorial discretion to determine which defendants merit the death penalty does not render the scheme invalid (*People v. Koontz, supra,* 27 Cal.4th at p. 1095); that the jury may consider unadjudicated criminal conduct in fixing the penalty (*People v. Kipp* (2001) 26 Cal.4th 1100, 1138 [113 Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Smith, supra,* 35 Cal.4th at p. 374); that intercase proportionality is not required (*People v. Lenart* (2004) 32 Cal.4th 1107, 1130–1131 [12 Cal.Rptr.3d 592, 88 P.3d 498]); that the jury need not be instructed certain factors can only be mitigating (*People v. Kraft* (2000) 23 Cal.4th 978, 1078 [99 Cal.Rptr.2d 1, 5 P.3d 68]); that the death penalty law does not deny capital defendants equal protection (*People v. Smith, supra,* 35 Cal.4th at p. 374; *People v. Panah, supra,* 35 Cal.4th at p. 500); and that " '[i]nternational law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements' " (*People v. Smith, supra,* 35 Cal.4th at p. 375).

### G. *Cumulative Error*

Defendant contends that the cumulative prejudice of the errors he alleges occurred in the guilt and penalty phases requires reversal. Our review, however, has disclosed only a few errors. For each error or possible error, we have determined that the prejudicial effect was minimal or nonexistent. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment.

### V. POSTVERDICT ISSUES

#### A. *Denial of Motion for Modification of Verdict*

The trial court denied defendant's motion for modification of the death verdict (§ 190.4, subd. (e)) from the bench. The court found that defendant murdered Landis Barnes and Albert Brown coldly and calculatedly in the motel room, that defendant murdered Tenoa Stevenson while he was running for his life and begging for mercy, and that the mitigating factors were substantially outweighed by these cold and brutal murders. Defendant argues that two procedural errors denied him his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and entitle him to a new modification hearing. We disagree.

■ Defendant complains first that the trial court prejudged his modification motion because it directed the prosecution to prepare a commitment order for a judgment of death prior to the hearing on the modification motion but did not direct the defense to prepare a judgment of life without the possibility of parole. As we explained in *People v. Seaton, supra,* 26 Cal.4th at page 696, "[t]he trial court's apparent goal was simply to ensure that, *if* it decided to sentence defendant to death, it could do so without any technical omissions in the pronouncement of sentence. Its request for the prosecutor's assistance in achieving this goal does not show that it prejudged the matter." (See also *People v. Dennis, supra,* 17 Cal.4th at p. 550.) That the trial court asked the prosecutor for a form of judgment without making the same request of the defense is not suspicious, inasmuch as a judgment of death is uniquely governed by the time limit set forth in section 1217.

■ Defendant also complains that the court violated the requirement that a ruling on the modification motion be based entirely on the evidence at trial (*People v. Williams* (1988) 45 Cal.3d 1268, 1329 [248 Cal.Rptr. 834, 756 P.2d 221]) because, before the hearing on the modification motion, the court heard a plea for the death penalty from Joan Stevenson, Tenoa's mother. Although the court should not have heard that plea, the record rebuts any inference that the trial court relied on it. The trial court announced that it had reviewed the evidence and the penalty "within the meaning of and pursuant to the dictates of" *People v. Lang* (1989) 49 Cal.3d 991 [264 Cal.Rptr. 386, 782 P.2d 627], which states plainly that "the trial court is prohibited by statute from considering, when ruling on the modification motion, any evidence not presented to the jury during the trial." (*Id.* at p. 1044.) Then, in stating her reasons for denying the motion, the trial judge referred only to the evidence presented to the jury. (*People v. Seaton, supra,* 26 Cal.4th at p. 695.) We likewise find that defendant forfeited any challenge to Ms. Stevenson's statement by failing to object at the modification hearing. (See *People v. Riel, supra,* 22 Cal.4th at p. 1220.)

### B. *Denial of New Trial Motion*

The trial court conducted a hearing on defendant's motion for new trial, at which defendant was represented by new counsel, and denied the motion. Defendant now claims the trial court erred in failing to grant his motion for new trial to the extent it was based on ineffective assistance of counsel under the state and federal Constitutions. No error appears.

#### 1. *Counsel's Concession That Defendant Was Guilty of Violating Health and Safety Code Section 11355*

In addition to the murders and attempted robbery, defendant was charged with and convicted of selling or furnishing a substance in lieu of a controlled substance in violation of Health and Safety Code section 11355. In opening statement, defense counsel told the jury that "you are going to convict [defendant] on the drug charge. There's no doubt about that. That's a given." In argument, counsel reiterated that defendant was guilty of that count but not guilty of the murders and attempted robbery. At the hearing on the motion for new trial, counsel defended this concession by pointing out it was "clear" defendant had been a participant in a drug transaction "and we were not trying to hide that." (See *People v. Hart* (1999) 20 Cal.4th 546, 630–631 [85 Cal.Rptr.2d 132, 976 P.2d 683].) Defendant agreed with this strategy at the time, but now contends that defense counsel's concession fatally undermined his testimony that he was unaware the drugs were bunk.

There is no inconsistency between counsel's concession and defendant's testimony. (See *People v. McDaniel* (1979) 24 Cal.3d 661, 670 [156 Cal.Rptr. 865, 597 P.2d 124].) As the jury was instructed, the drug charge required proof only that a person agreed or offered to sell a controlled substance and then "delivers another substance in lieu thereof." Accordingly, counsel nowhere conceded that defendant was aware the drugs were fake.

Defendant appears to admit as much in his reply brief, but faults trial counsel nonetheless for failing to emphasize to the jury that defendant could be guilty of violating Health and Safety Code section 11355 even if he never knew the drugs were fake. No further explanation was required. In addition to the instructions that listed the elements of the crime, defense counsel told the jury that defendant "wasn't there to rip anyone off," and the prosecutor told the jury that the defense position concerning the charge of attempted robbery (and the subsequent murders) was that "he didn't know the dope was bunk. He thought it was real." Thus, it is not reasonably likely the jury misconstrued the defense argument to constitute an admission that defendant knew the drugs were fake.

### 2. *Allowing Defendant to Testify and Failing to Bifurcate Prior-murder-conviction Special Circumstance*

Defendant claims next that, in light of counsel's failure to bifurcate the prior-murder-conviction special-circumstance allegation, counsel was constitutionally ineffective in calling defendant to testify. We have already rejected defendant's claim that counsel erred in failing to bifurcate this special-circumstance allegation. (See pt. III.B.3., *ante*.) We likewise reject the claim that calling defendant to testify was an unreasonable tactical choice.

The gist of defendant's claim is that the beneficial parts of his in-court testimony could have been (and were) presented through his police statements, thus eliminating the need for him to testify at trial and the opportunity to impeach him with his prior convictions. Although defendant's final account to police often tracked his in-court testimony,[23] defendant completely ignores the difference between giving the jury a personal account of what happened and subjecting the jury to the numerous contradictory versions as recounted by a police officer who had heard it from defendant at an earlier time. This was a matter of grave concern to defense counsel, who realized they could not use a strategy "that said Eric was not present, or that the identification was wrong, or something of this nature." In light of defendant's numerous contradictory statements to police, which the prosecution intended to and did present to the jury, counsel concluded it was "absolutely essential" that defendant testify in person, since "[w]ithout his testimony, we felt we had absolutely no chance whatsoever at guilt phase." Counsel hoped thereby "to make him into a credible witness so the jury would acquit him." This could occur only by putting defendant on the stand.

Counsel's fear "if we did not put him on the stand, that we were looking at an absolutely certain guilty verdict" appears reasonable. Had the jury heard only the contradictory versions recounted as hearsay by police witnesses, the jury would likely have discounted his testimony entirely and convicted him based solely on the testimony of Cunningham, Santiago, and Johansen. (Cf. *Johnson v. Baldwin* (9th Cir. 1997) 114 F.3d 835, 840 [the evidence of guilt was so weak the jury "probably" would not have convicted the defendant had he not testified falsely].) If, on the other hand, the jury could be convinced by defendant's demeanor that his testimony was (or possibly could be) true, then defendant would be acquitted. As counsel was aware, however, this strategy would allow the prosecution to impeach defendant with his prior convictions.

---

[23] There were, nonetheless, notable differences. At trial, defendant denied knowing the drugs were fake or hearing Hicks mention his plan to "jack" the buyers before they entered the motel room. Defendant also denied remaining in the motel room during the entire shooting episode and, in particular, denied seeing who was shot first or when Hicks switched weapons.

Thus, neither strategy was risk free. We cannot say that, in making the difficult choice between these unappealing alternatives, counsel's selection was unreasonable.

Counsel also had to weigh the likelihood that the trial would proceed to a penalty phase. In that circumstance, the jury would eventually hear about all of defendant's prior convictions. Counsel believed, however, that the *way* in which the jury discovered the prior convictions would affect their evaluation of the appropriate penalty, and that it was therefore preferable to disclose that information at the outset of the case. On this record, the delicate issues of timing were quintessential matters of strategy, and once again we cannot say that counsel's choices were unreasonable.

Defendant's unprovable assertion that, in hindsight, he would have been "better served" by not testifying does not establish a denial of the effective assistance of counsel. As the trial court found, counsel's choice "was reasonable, based on the facts that were presented here, and certainly within the bounds of the behavior a reasonable attorney would do under the circumstances, though not necessarily the way any other individual attorney may have handled the particular matter."

3. *Failing to File Section 995 Motion to Dismiss Attempted Robbery Charge and Felony-murder Special Circumstances*

The second amended felony complaint charged defendant, inter alia, with first degree robbery. At the preliminary hearing, the prosecutor amended the count to charge an *attempted* robbery. So amended, the magistrate sustained the charge as well as the robbery-murder and burglary-murder special circumstances. Defendant now contends, as he did in his motion for new trial, that counsel was constitutionally ineffective in failing to file a section 995 motion to dismiss the attempted robbery charge and the felony-murder special circumstances. We find that counsel was not deficient because such a motion would not have succeeded.

Defendant notes, correctly, that nothing elicited at the preliminary hearing indicated that the money was present in the motel room at the time of the murders—but (contrary to defendant's assertion) the attempted robbery charge did not depend on the money being present. As the magistrate found, defendant *believed* the money was present. According to Cunningham's testimony, Barnes said that defendant and his "buddy" wanted to see the money. Unknown to defendant, Stevenson said he wanted to test the cocaine first. About 15 minutes later, after Stevenson returned to the room, defendant and his "buddy" brought in the packages. Although Cunningham had earlier asked Stevenson if "our girl" was here and Stevenson said he had sent her

back, this was *before* defendant entered the room. Moreover, the import of the statement that Stevenson had "sent her back" was, as Cunningham conceded, ambiguous. Since defendant would not have brought in the packages if he thought "there had been no money," the magistrate reasonably inferred that defendant believed the money was present from the fact that defendant brought in the packages. Thus, even if the money was not *actually* present at that point, this would not undermine the attempted robbery charge or the felony-murder special circumstances, which were based on an attempted robbery. (See *People v. Beardslee* (1991) 53 Cal.3d 68, 87 [279 Cal.Rptr. 276, 806 P.2d 1311].)

### 4. *Introducing Videotape of Crime Scene*

Defense counsel showed the jury a videotape of the crime scene at the used car lot to demonstrate to the jury "what could have been seen by Mr. Johansen" from his vantage point. This tape also included footage of the crime scene at the motel room, including the bullet holes, the bodies, and some blood. Defense counsel justified his failure to edit the videotape to eliminate the motel room scenes by pointing out that "all of the goriness that had occurred in that room had already been shown to them time and time again" by photographic evidence.

We recognize that cocounsel would have preferred that the videotape have been edited before being shown to the jury and that while the tape was shown, an alternate juror (who never participated in deliberations) averted her eyes when a body was moved and kept them averted for the remainder of the tape. However, it is also true, as cocounsel testified, "that everything that was shown on that portion of the videotape had been admitted through still photographs by the prosecution" and, as the trial court noted, the other jurors "seemed to be interested in [the videotape] and watching it." Because counsel's failure to edit the videotape thus does not undermine confidence in the outcome, the trial court did not err in denying the motion for a new trial.

### C. *Record Correction Process*

Defendant claims the record correction process revealed several significant violations of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, the corresponding provisions of the state Constitution, and Penal Code sections 190.9 and 1138. He asserts the errors, which fall into three categories, mandate a new trial. We disagree.

First, defendant complains the trial court consulted with the parties by telephone, without a record being made, to discuss four requests by the jury. The jury asked for a television with a videotape player to view a videotape

exhibit and for photographic exhibits of the victims; the jury also asked whether the verdicts should be returned serially or all at once and whether it was permissible to consider the deterrent effect of the death penalty.

 Although the failure to transcribe these discussions was a violation of section 190.9, which requires that all proceedings in a capital case be conducted on the record with a reporter present and a transcript prepared, " '[n]o presumption of prejudice arises from the absence of materials from the appellate record [citation], and defendant bears the burden of demonstrating that the record is inadequate to permit meaningful appellate review.' " (*People v. Wilson, supra,* 36 Cal.4th at p. 325.) Defendant has not discharged his burden. He does not contend that he objected to the responses the court gave, nor does he object to them now. As the trial court found, these were "fairly mundane requests." Defendant has not demonstrated that the trial court responded to these requests without notifying counsel (see *People v. Carter* (2003) 30 Cal.4th 1166, 1215 [135 Cal.Rptr.2d 553, 70 P.3d 981]) but, even if the trial court did so, defendant has not demonstrated prejudice. (*Ibid.*) Assuming arguendo the trial court also erred in conducting these proceedings without obtaining a personal waiver of defendant's right to be present, we do not detect any prejudice or unfairness to defendant. (*People v. Lucero* (2000) 23 Cal.4th 692, 717 [97 Cal.Rptr.2d 871, 3 P.3d 248]; see also *People v. Hawthorne, supra,* 4 Cal.4th at pp. 67–69 & fn. 13.)

Second, defendant complains that People's exhibit 33, which consisted of several photographs of the Dwayne Reed murder scene introduced at the penalty phase, and the juror handbook were lost. As to the photographic exhibit, the People produced the originals and color copies of the photographs during the record correction process. The version of the juror handbook given to the prospective jurors was not found. In neither instance has defendant demonstrated an impairment of his right to meaningful appellate review. (Cf. *People v. Heard* (2003) 31 Cal.4th 946, 969–971 [4 Cal.Rptr.3d 131, 75 P.3d 53] [missing juror questionnaires].)

Third, defendant complains that the trial court erred in denying his request to seal his attorney's billing records, which had been included in the clerk's transcript, and asks us to order them sealed or, in the alternative, to direct that no information contained therein may be used against him in this or future proceedings. This contention, which does not involve the validity of the judgment or the process leading to it and does not seek reversal or modification of any part of the judgment, is not cognizable on appeal. Defendant may seek relief, if any, by separate motion.

## VI. Disposition

The judgment is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Curry, J.,[*] concurred.

Appellant's petition for a rehearing was denied April 12, 2006. Werdegar, J., did not participate therein.

---

[*]Associate Justice of the Court of Appeal, Second Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.